# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
## March 23, 2010 Session

## STATE OF TENNESSEE v. PERRY AVRAM MARCH

### Direct Appeal from the Criminal Court for Davidson County
### No. 2004-D-3113     Steve Dozier, Judge

---

### No. M2007-00053-CCA-R3-CD - Filed January 27, 2011

---

Following a jury trial, Defendant, Perry Avram March, was convicted of second degree murder, a Class A felony, abuse of a corpse, a Class E felony, and destruction of evidence, a Class C felony. The trial court sentenced Defendant as a Range I, standard offender, to twenty-five years for his murder conviction, two years for his abuse of a corpse conviction, and five years for his destruction of evidence conviction. The trial court ordered Defendant to serve his sentences for his Class C and Class E felonies consecutive to his sentence for his murder conviction, and his murder conviction in this case consecutive to his sentence in case no. 2005-D-2854 of twenty-four years for his conviction of conspiracy to commit first degree murder, for an effective sentence of fifty-six years. On appeal, Defendant argues that the trial court erred in admitting into evidence (1) his statements to Detective Postiglione on August 12, 2005; (2) his taped conversations with Nathaniel Farris while Defendant was housed in the Davidson County Jail awaiting trial; (3) Leigh Reames' testimony concerning Defendant's prior conduct; and (4) the draft of a novel written by Defendant. Defendant also contends that the State's prosecution of the offenses of abuse of a corpse and tampering with evidence are time-barred and, alternatively, that the tolling of the statute of limitations in criminal cases violates his constitutional right to travel and denies him equal protection under the law. Defendant submits that the cumulative effect of these errors denied him his constitutional right to due process. After a thorough review we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

John E. Herbison, Nashville, Tennessee; William D. Massey and Lorna S. McClusky, Memphis, Tennessee, for the for the appellant, Perry Avram March.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Tom Thurman, Assistant District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

The murder victim in this case was Defendant's wife, Janet March. Carolyn Levine, the victim's mother, testified that Defendant and the victim met while they were both students at the University of Michigan. The couple married on June 14, 1987, and were married when the victim disappeared on August 15, 1996. Ms. Levine identified Defendant at trial as her daughter's husband. Ms. Levine said that the victim, who was thirty-three years old when she disappeared, was five feet, three or four inches tall and weighed approximately one hundred pounds. At trial, Ms. Levine identified the victim from a photograph.

After graduation, Defendant and the victim moved to Nashville so that Defendant could attend Vanderbilt Law School. The Levines paid Defendant's law school tuition and supported the couple for three years while Defendant was in school. After graduation, Defendant joined a Nashville law firm. In July 1995, the victim and Defendant moved into a newly built house located at 3 Blackberry Road in Forrest Hills.

Ms. Levine said that the victim's son, Samson March, was born on August 27, 1990, and her daughter, Tzipora March, was born on May 17, 1994. Ms. Levine described the victim as a "very attentive" and "very nurturing" mother. Ms. Levine and the victim talked on a daily basis, and the victim never left town without providing Ms. Levine her itinerary and other pertinent information concerning the children's care and schedules.

Ms. Levine stated that she first became aware that the victim and Defendant were undergoing marital problems in 1993, but she did not feel the problems were insurmountable. Ms. Levine said that she had a good relationship with Defendant, and both Defendant and the victim came to her individually for advice. The couple went to marriage counseling in 1991 or 1992, and Defendant began to see a psychiatrist. The victim joined Defendant during his individual counseling sessions in 1996.

Ms. Levine said that the couple's situation deteriorated further. Defendant told Ms. Levine in the spring of 1996 that he was afraid the victim was going to divorce him and take the children away from him. The victim and Defendant began arguing in front of the children, and Ms. Levine told Defendant that he needed to leave the residence because the

-2-

children were upset by the couple's arguments. Defendant found a house to rent, but he did not immediately move out of the marital residence. Ms. Levine said, however, that Defendant stayed in a hotel for approximately six to eight nights before the victim disappeared.

Ms. Levine planned to accompany the victim to her appointment with a divorce attorney on Friday, August 16, 1996. However, around midnight on August 15, 1996, Defendant called the Levines and told them that the victim had left the house after an argument. Ms. Levine said that to her knowledge, the victim had never done that before. Ms. Levine told Defendant to call her when the victim returned.

Ms. Levine talked to Defendant several times by telephone on August 16, 1996. During one conversation, Defendant said that one of his son's schoolmates had arrived for a play date, and Ms. Levine instructed Defendant to let the child play with Samson. Defendant told Ms. Levine that he had explained to the children and the children's part-time babysitter that the victim had left early that morning to work on a large art project.

Defendant told Ms. Levine that the victim had taken two small shopping bags, a small, gray suitcase, her passport, and $1,500 with her when she left. The Levines drove to the airport to search for the victim's vehicle but were unsuccessful. Defendant initially said that the victim was wearing khaki shorts and a navy short-sleeved, collarless top when she left, but later told Ms. Levine that the victim had changed into blue jeans before leaving.

Defendant said that the victim had handed him a typewritten note entitled "Janet's 12-day vacation" when she left which contained a list of chores for Defendant to do while the victim was gone. Ms. Levine stated that the victim often made lists, but they were always hand-written. When she helped Defendant put the children to bed on August 16, 1996, Ms. Levine noticed a yellow-lined legal pad by Defendant's computer in his office which contained a handwritten list of similar chores. Ms. Levine said that the words "two weeks" in Defendant's handwriting were circled at the top of the list. Ms. Levine stated that the victim never used capital letters in her notes, and she dated the notes at the top of the page. Ms. Levine stated that the typed note entitled "Janet's 12 day vacation" used capitalizations and was dated at the bottom.

Ms. Levine initially believed Defendant's explanation for the victim's absence. By Sunday night, however, she grew increasingly concerned because the victim had never left the children before without telling someone where she was going. The Levines wanted to contact the police, but Defendant and his brother, Ron March, convinced them to wait for twelve days. Ms. Levine agreed because she still believed the victim would return, and Ms. Levine did not want to embarrass her by getting the police involved.

The victim had planned a birthday party for her son for Sunday, August 25, 1996, and the invitations had been mailed before the victim's disappearance. Ms. Levine found it "unbelievable" that the victim would not return for her son's birthday party which went on as planned. Ms. Levine stated that Samson started school on the following Monday, August 26, 1996, and the victim had planned to take cupcakes to her son's classroom on his birthday on August 27, 1996. Ms. Levine found it "inconceivable" that the victim would miss these events in her child's life.

Ms. Levine said that Defendant's father, Arthur Marsh, who lived in Mexico, came to Nashville to attend Samson's birthday party, but he left the next day for Chicago. Defendant explained, "My dad has a big mouth, he tells everything." Ms. Levine said that around this time, Defendant also said, "[T]hat f___ing Janet has ruined my life." Ms. Levine was "shocked and horrified" because Defendant had never used this kind of language in front of her before.

The Levines told the police about the victim's disappearance on August 29, 1996. The victim's grey Volvo was found backed into a parking space at the Brixworth Apartments on September 7, 1996. At trial, Ms. Levine identified the vehicle as the victim's from a photograph. The victim's purse, three dresses, two pairs of shorts and a child's car seat were in the vehicle. A gray suitcase which Defendant told Ms. Levine the victim was carrying when she left was not in the car.

Ms. Levine stated that Defendant's demeanor and attitude changed after the victim's vehicle was found. Ms. Levine was concerned about the children during this period, and she and Defendant spoke with a child psychologist for guidance in answering the children's questions about the victim. Defendant was angry, however, when Ms. Levine spoke to one of Samson's teachers, and he told Ms. Levine not to call the school again.

Ms. Levine stated that Defendant took the children to Chicago for Rosh Hashana on Saturday, September 14, 1996. Arthur March remained in Nashville because Defendant said that it was too expensive for his father to travel to Chicago. Defendant and the children returned home on September 15, 1996, but Defendant would not let Ms. Levine see the children. Defendant later moved to Chicago with the children. Ms. Levine said that she next saw the children in Chicago in December 1996, after she and Mr. Levine petitioned the court for grandparent visitation rights. During a second court proceeding concerning visitation, Ron March, who represented Defendant, informed the trial court that Defendant had moved to Mexico with the children. Ms. Levine testified that she and her husband, as well as the trial judge and the children's guardian ad litem, were all surprised by this announcement.

Ms. Levine said that a memorial service for the victim was held on November 17, 1996, but Defendant did not attend. Ms. Levine stated that the victim primarily used a Visa credit card, and Defendant used a MasterCard credit card. Neither credit card was used by the victim after her disappearance, but Defendant used both the Visa and the MasterCard after August 16, 1996. Ms. Levine stated that Defendant owned a mountain bike at the time of the victim's disappearance and described Defendant "as an avid mountain biker."

Ms. Levine said that Defendant moved his personal property to Chicago, and the victim's personal items were stored in the garage of the Blackberry Road house after it was sold. Ms. Levine began to sort through the items in early 1997. One of the movers found an envelope with the logo of a company with whom the victim did business, and with the victim's name handwritten on the flap of the envelope. Ms. Levine stated that the envelope contained two typewritten letters. After briefly reading a portion of one of the letters, Ms. Levine called the police.

John Ritchie testified that he worked for a cabinet company in August 1996. On August 15, 1996, he and John McAllister installed two butcher block counter tops in the victim's residence. The two men arrived at the victim's house at approximately 4:00 p.m. Mr. Ritchie said that a Volvo and a Jeep were parked in the driveway. Mr. Ritchie talked with the victim, who knew Mr. Ritchie's family, while the counter tops were being installed. The victim asked the men to also tighten the kitchen faucet, and Defendant, who had entered the kitchen through the back door, handed Mr. McAllister a pair of pliers.

Deneane Beard testified that she cleaned the March residence from 1994 until 1996 while she was in nursing school. Ms. Beard said that she normally worked one day a week, either in the morning or in the afternoon, depending on her school schedule. The victim left Ms. Beard handwritten notes outlining the chores that needed to be done that day. Ms. Beard was scheduled to work at the March residence on Friday, August 16, 1996. Defendant called Ms. Beard before she left for work to find out what time she would arrive at the residence and told Ms. Beard that the victim had gone to California on a business trip. Ms. Beard arrived at the house between 8:00 a.m. and 8:30 a.m. and found that the house had already been cleaned.

Ms. Beard stated that she continued to work for Defendant until approximately September 16 or 17, 1996. On her last day, police officers knocked on the front door. Ms. Beard let the officers into the house and then continued cleaning. Ron March, who was at the house that day, asked her to "hurry things up." Mr. March had a telephone conversation and then told Ms. Beard she should leave. Mr. March escorted Ms. Beard to her car while holding on to her arm. Ms. Beard said that Arthur March was not present that day although she had seen him at the house before.

Marissa Moody testified that in 1996 her son attended the same preschool as Samson March. On August 15, 1996, Ms. Moody and the victim arranged a play date for the two boys for the following day. Ms. Moody arrived at the victim's house on August 16, 1996, between 9:30 a.m. and 10:00 a.m., and Samson answered the door. Ms. Moody did not see the victim, but Defendant came out of his office in response to the door bell. Ms. Moody said that Defendant was surprised because he did not know about the play date. Ms. Moody stated that a rolled up oriental rug was in the middle of the floor in the entry hall, and Samson was jumping up and down on the rug. Ms. Moody picked her son up at approximately 2:00 p.m., but Defendant was not home.

Laura Zinker testified that she met the victim in 1988, and the two women became close friends. The victim visited Ms. Zinker in the summer of 1996 and told Ms. Zinker about her marital problems. On cross-examination, Ms. Zinker said that she never saw any sign of physical abuse, but on redirect examination, Ms. Zinker stated that she had observed instances where Defendant verbally abused the victim. Ms. Zinker said that Defendant was "very critical" of the victim and demeaning of her intelligence.

Laurel Rummel testified that she had known the victim since she was eight years old. Ms. Rummel spoke to the victim by telephone on the morning of August 15, 1996, and the victim sounded hurried and "a little distracted." Defendant called Ms. Rummel at approximately 10:00 p.m. on August 15, 1996, and told Ms. Rummel that the victim had packed a bag and left the house. Ms. Rummel had previously made an appointment to meet Defendant on August 16, 1996, to discuss the purchase of carpeting for his new law office. Ms. Rummel stated that Defendant kept the appointment but "was very troubled, very worried about where [the victim] was, when she would come home, and he seemed pale and shaken up."

Diane Saks testified that she had known the victim all of Ms. Saks' life. She described the victim as a protective and loving mother. Ms. Saks said that Defendant called her after he moved to Chicago. During one conversation, Defendant asked Ms. Saks if she thought he had killed the victim. Ms. Saks was surprised by the question. Defendant asked Ms. Saks if she could believe that he put the victim in the back of his vehicle, leave the children home alone while they were sleeping, and then return and pretend "like nothing ever happened." Ms. Saks' husband took the receiver from her and asked Defendant not to call any more.

Dr. Thomas W. Campbell, a psychiatrist, testified that Defendant was his patient from November 1992 until March 1995, and then again from July 1996 to September 1996. Dr. Campbell said that the victim accompanied Defendant to some of the 1996 counseling sessions, and he last met with both Defendant and the victim on approximately August 5,

1996. Dr. Campbell described the session as "volatile," and he suggested that Defendant and the victim try a trial separation "so they could calm down."

On cross-examination, Dr. Campbell said that in one of the last sessions, the victim asked Defendant during a heated exchange if he had told Dr. Campbell about the incident at his former law firm. Dr. Campbell stated that the incident "was not a big deal on [Defendant's] radar screen," but the victim was very angry when she asked the question. On redirect examination, Dr. Campbell stated that Defendant told him that he had to leave his former law firm because of conflict with someone in the firm. Defendant did not tell Dr. Campbell any of the details surrounding the incident.

Dr. Stacey Ann Goodman testified that she met the victim and Defendant at the University of Michigan in 1981, and she and another friend arranged a date between Defendant and the victim. Dr. Goodman and the victim became roommates in the spring of 1982. Dr. Goodman stated that she frequently rode with the victim in the victim's vehicle and that she never saw the victim back into a parking space. Dr. Goodman moved to Nashville in 1987 for her residency at Vanderbilt University Medical Center and resumed her friendship with the victim and Defendant. Dr. Goodman was interviewed by the media about the victim's disappearance in January 1997. Defendant telephoned Dr. Goodman from Chicago either the day of or the day after the interview. Dr. Goodman stated that Defendant was very angry. He screamed and swore at her and told Dr. Goodman that he would "get" her when he came to Nashville. Dr. Goodman said that she was scared and upset after the telephone conversation, and she filed a report with the Metro Nashville Police Department about Defendant's threat.

Ella Goldshmid testified that she worked as a part-time babysitter for the victim's children for approximately six years before the victim's disappearance. The victim always notified Ms. Goldshmid when she planned to travel, and Ms. Goldshmid would help Ms. Levine care for the children in the victim's absence. Ms. Goldshmid said that when the victim went away, she left "very explicit instructions" concerning the children's care and schedules which were either handwritten or dictated to Ms. Goldshmid to write down.

Ms. Goldshmid said that in August 1996 she worked for the victim on Wednesdays and Fridays. The victim was not acting like herself when Ms. Goldshmid arrived at the victim's residence on August 14, 1996. Ms. Goldshmid described the victim's face as "grey, stone-like." Ms. Goldshmid said that the victim would usually chat with her for a few minutes after she arrived. On August 14, 1996, however, the victim told Ms. Goldshmid that she was very busy and needed to work on the computer. The victim went into her office and closed the door, and Ms. Goldshmid did not see the victim for the remainder of the day. Ms.

Goldshmid said that the victim did not normally use the computer, and it was the first time Ms. Goldshmid had ever seen the victim work on the computer all day.

Ms. Goldshmid arrived for work on August 16, 1996, between 9:30 a.m. and 10:30 a.m. Defendant told Ms. Goldshmid that the victim had flown to California to visit her brother, Mark Levine. Ms. Goldshmid stated that it was unusual for the victim to leave town without telling her. Ms. Goldshmid said that a rolled up rug was blocking the door leading to the kitchen. She did not know where the rug came from, and she never saw it again after that day. Ms. Goldshmid last stayed with the March children on September 8, 1996. Defendant did not tell Ms. Goldshmid that he was moving to Chicago with the children.

Tim Mason, a detective with the Metro Nashville Police Department, testified that he was notified on September 7, 1996, that the victim's Volvo had been found in the parking lot of the Brixworth Apartments. The locked Volvo was backed into a parking spot at the rear of the apartment complex approximately two hundred yards from the main road. Detective Mason identified the victim's vehicle from a photograph at trial.

David Miller testified that in 1996 he was a detective with the Metro Nashville Police Department assigned to the investigation of adult missing persons. Detective Miller said that Carolyn and Lawrence Levine came to the police department on August 29, 1996, to report the victim's disappearance. Detective Miller performed routine searches of area hospitals and other locations, the victim's credit cards, and the victim's bank accounts, but he did not discover any information concerning the victim's whereabouts. Detective Miller took Defendant's statement on September 10, 1996, at the Levines' residence. Detective Miller stated that Defendant appeared nervous. Detective Miller advised Defendant of his *Miranda* rights and told him that he had the right to refuse to consent to a search of his residence. Defendant told Detective Miller that he was an attorney and understood his *Miranda* and Fourth Amendment rights. Defendant wrote out his statement by hand. In his statement, Defendant said that on August 15, 1996, he and the victim had a conversation after the children had gone to bed. Defendant stated that the victim grew "frustrated" and "upset," but he remained calm. Defendant called a local hotel and booked a room, but the victim said that "she had a different idea tonight." The victim typed something on the computer and then went upstairs. When she came downstairs, she had three small bags with her. The victim handed Defendant her "12-Day Vacation Note" and told him to sign it which Defendant did. The victim said something like "Your turn, see ya,[sic]," and left the house.

On September 16, 1996, Detective Miller told Defendant's attorney that he intended to execute a search warrant for Defendant's computer on the following day. Detective Miller arrived at Defendant's residence on September 17, 1996 and discovered that the hard drive from Defendant's computer had been ripped out.

Brad Corcoran, a detective with the Metro Nashville Police Department, testified that he processed the victim's Volvo. The exterior of the Volvo was covered with dirt, dust, and pollens, there were cobwebs in the wheels, and rust was present on the disk brakes, all of which indicated that the Volvo had not been moved for a significant period of time. A purse containing the victim's identification was found in the pocket of the left front door, and a child's car seat was in the backseat behind the driver's seat. A black suitcase containing clothes and a canvas bag containing toiletry items were also in the Volvo. The front passenger seat was pushed back, and the driver's seat was positioned closer to the steering wheel. A fifty-dollar bill was in the glove compartment, and the purse contained eleven dollars in cash, various credit cards, and the victim's passport. A pair of white shoes was on the floor in front of the driver's seat. Detective Corcoran also processed Defendant's Jeep on September 12, 1996, and found two fibers and a hair in the backseat. Detective Corcoran lifted latent fingerprints from both vehicles. On cross-examination, Detective Corcoran said that the Jeep did not appear to have been cleaned before it was processed, but he detected an order of some type of cleaner or disinfectant when he opened the rear door.

Kim Garbler testified that she was an employee of the private investigation company that was hired by Mr. Levine on September 7, 1996, to assist in the investigation of the victim's disappearance. Ms. Garbler interviewed Defendant at the beginning of the investigation and thought it unusual that he referred to the victim in the past tense. Ms. Garbler began interviewing the residents of Brixworth Apartments to determine if anyone had seen the Volvo in the apartment complex's parking lot. Ms. Garbler stated that Defendant was angry when he learned what she was doing. Defendant telephoned Ms. Garbler and demanded that she fax him a list of everyone she had spoken to and what they had said by the end of the day. Defendant then hung up the telephone.

Peter Rodman, a flight attendant for an international airline company, testified that he lived at Brixworth Apartments in 1996, but he was frequently out of town. Mr. Rodman said that he returned home at approximately 1:00 a.m. on August 16, 1996. As he pulled into the parking lot, Mr. Rodman noticed that a man, wearing a jogging suit, was slowly walking a bicycle down the middle of the parking lot. Mr. Rodman parked his vehicle and opened the back door to retrieve some items. When he turned around, he noticed that the man was "frozen in place" and appeared shocked. Mr. Rodman said that he was approximately ten to twelve feet from the man, and the parking lot was well lit. Mr. Rodman saw Defendant's photograph in a news article about the victim's disappearance in February 1997. Mr. Rodman called Detective Mike Smith with the Metro Nashville Police Department and told him about the incident. Mr. Rodman identified Defendant at trial as the man with the bicycle.

Travis West, a manager for Cumberland Transit, a bicycle shop in Nashville, testified that a mountain bicycle differed from a road bicycle in that a mountain bicycle had a smaller

frame and wheels and weighed between twenty-five to thirty-two pounds. Mr. West said that the bicycle shown with Defendant in the photographs introduced as exhibits 3A and 3B was an older model mountain bike. Mr. West said that he was able to put his own mountain bicycle inside his Honda Civic by removing the front wheel with a "quick release" mechanism. Mr. West stated that it took between approximately five and fifteen seconds to remove the front wheel and the same amount of time to reattach the front wheel to the bicycle. Mr. West also said that a mountain bicycle could be placed in the front seat of his parent's Volvo, which was similar in size to that of the victim's vehicle, after the front wheel was removed. Mr. West stated that the dirt reflected in the photograph of the victim's front passenger floorboard appeared to be consistent with a tire or part of a bicycle resting there.

Bill Pridemore, a detective assigned to the homicide section of the Metro Nashville Police Department, testified that he submitted certain fibers and a hair sample found in Defendant's Jeep to the Federal Bureau of Investigation ("FBI") for analysis. Detective Pridemore also submitted a hair sample found in Defendant's Jeep and hair samples from the victim's hairbrush to Orchid Cellmark Labs for DNA testing. The parties entered an agreed stipulation into evidence stating that the mitochondrial DNA analysis of the hair sample recovered from the cargo area of Defendant's Jeep was consistent with the victim's DNA profile.

Karen Korsberg testified that she is employed as an examiner in the FBI's trace evidence unit in the laboratory in Quantico, Virginia. Ms. Korsburg examined three samples of debris collected from the Defendant's Jeep for the presence of carpet fibers. Ms. Korsburg explained that carpet fibers are generally courser or larger than fibers in clothing and may have specific shapes. Ms. Korsburg said that the sample taken from the Jeep's front trunk area contained blue, grey, and green round carpet type fibers; a reddish orange trilobel carpet type fiber; a pink trilobel carpet type fiber, and an off-white carpet type fiber. The sample taken from the back of the Jeep's trunk area contained a reddish orange trilobel carpet fiber, a pink trilobel carpet fiber, and a light grey or blue trilobel carpet fiber. The sample taken from the Jeep's front and back seats contained reddish orange trilobel carpet-type fibers, light blue trilobel carpet-type fabrics, a grey, round carpet type fiber, and an off-white trilobel carpet type fabric.

Annette Noel Hall testified that in 1996 she was employed by WSMV Channel 4, an NBC affiliate. Excerpts from Ms. Hall's 1996 interview of Defendant were played for the jury. In those excerpts, Defendant denied that he and the victim fought during the evening of August 15, 1996, and described it as a "relatively benign evening." Defendant denied removing the hard drive from the computer located at his residence and said it was as much "an enigma" to him as it was to the police. Defendant said that he would not allow the

investigating officers to interview his son because Samson was asleep when the victim left the house on August 15, 1996, and did not know anything about the victim's disappearance.

Redina Friedman testified that she practices family law in Chicago, Illinois and is a certified child representative with the Cook County Court System. Ms. Friedman was appointed guardian ad litem to the March children in March 1999 after the Levines filed a petition requesting visitation rights with the children. Ms. Friedman interviewed the children at their home in Chicago and was concerned with the absence of any photographs or other reminders of the victim. Ms. Friedman said that Defendant opposed granting the Levines visitation rights because he was concerned that they would allow the police and the news media to interview his son. Defendant told Ms. Friedman that Samson "knew absolutely nothing" about the victim's disappearance, and that he did not see or hear anything on the night she left. Ms. Friedman stated that the children had a close relationship with their grandparents, and despite Defendant's concerns, Ms. Friedman filed a written report with the court recommending that visitation be granted. After the report was filed, Defendant became "openly hostile" to Ms. Friedman and told her that "he could disappear in Singapore and no one would ever see them again."

Mark Levine, the victim's brother, testified that he returned home from California when he learned of the victim's disappearance. One day when Defendant was at his parent's home, Mark Levine asked Defendant if he could see the note entitled "Janet's twelve-day vacation" which was saved on Defendant's computer. The two men left in separate vehicles, and Defendant drove away first at a fast rate of speed. Mark Levine followed Defendant but fell behind when Defendant ran a red light. When he arrived at Defendant's house, the door was locked. Mark Levine rang the door bell several times before Defendant opened the door. Defendant had already turned on the computer. While reading"Janet's 12- day vacation" note, Mark Levine noticed another document in the computer which appeared to be a list by the victim of incidents where Defendant mistreated her. The list was six pages long, single-spaced, and with no paragraph indentations. Defendant initially said that Mark Levine could print off a copy of the document. Mark Levine said that he did not know how to print from Defendant's computer. Defendant did not explain how to use the print function, and Mark Levine never obtained a copy of the list.

Mark Levine said that he, his parents and Defendant were sitting on the Levines' patio when Detective Miller arrived shortly after the victim's disappearance had been reported to the police. Mark Levine stated that Defendant "just turned white when he saw that car and he started shaking, just overwhelmingly shivering, because I remember he tried to stand up twice and fell back in his chair twice he was shaking so much." Defendant asked Mark Levine to call his brother, Ron March. Mark Levine delayed placing the call and then left a message on Ron March's answering machine. On cross-examination, Mark Levine

-11-

acknowledged that the computer showed that the "12-day vacation note" was saved at 8:15 p.m. on August 15, 1996.

Leigh Reames testified that in 1991 she worked as a paralegal in the same law firm as Defendant. Ms. Reames stated that she received three anonymous letters which contained sexual references. Ms. Reames turned the letters over to her supervisor, and, after an internal investigation, it was determined that Defendant had written the letters. Ms. Reames felt uncomfortable working for the firm and resigned. An out-of-court settlement agreement was reached in which Defendant agreed to pay equal monthly payments until the forty-eighth installment when a balloon payment of $12,500 was to be paid. Ms. Reames stated that she never received the balloon payment which was scheduled to be paid in early 1996. Instead, she received a letter from Defendant dated August 13, 1996, and postmarked August 16, 1996, in which Defendant told Ms. Reames that he would be able to make the balloon payment in October 1996. Ms. Reames testified that the two typewritten letters found in the envelope among the victim's possessions by Ms. Levine in early 1997 were the originals of the second and third letters she had received from Defendant in 1991. Ms. Reames stated that letters she received in 1991 were only copies of the originals.

Jon Jones testified that he represented the Levines in litigation involving the property of the victim's estate. Mr. Jones took Defendant's deposition in October 1996 in connection with this civil litigation. A redacted video of the interview was introduced as an exhibit and played for the jury at trial. In his interview, Defendant generally relayed the same information contained in his statement to the police. Defendant acknowledged that the victim was upset with him on August 15, 1996, but said it was just "normal tension." Defendant stated that he did not believe that his prior contact with Leigh Reames was a problem on August 15, 1996. Defendant said that the victim knew about the incident and the settlement agreement. Defendant said he believed he and the victim last discussed the issue in June or July 1996, including Defendant's plan to pay off the balance of his debt. Defendant acknowledged that he executed a will in September or October 1996 in which he changed the beneficiary from the victim to the children and appointed his brother, Ron March, as administrator and guardian of the children.

Michael Levine, the victim's first cousin, testified that he served as the victim's and Defendant's insurance agent prior to the victim's disappearance. In October 1994, the Marches purchased a $250,000 term policy on the victim's life with Defendant as beneficiary. Defendant also had a life insurance policy in the face amount of $400,000 with the victim as beneficiary. In January 1997, Michael Levine received a copy of a letter which Defendant had sent to the insurance company asking that Michael Levine be removed as his insurance agent. Michael Levine said that the beneficiary of the victim's life insurance policy was changed from Defendant to the victim's estate, with the children as contingent

beneficiaries, by the probate court, and the insurance proceeds were paid in trust to the probate court in 2003.

Sherri Lee, a beautician, testified that she cut both the victim's and Defendant's hair in 1996. Ms. Lee said that she was cutting the victim's hair in July 1996 when Defendant entered the salon. He approached the victim, and the victim seemed nervous "and she sort of [cowed] away a little." Ms. Lee had never observed the victim act that way around Defendant. Ms. Lee said that Defendant had an appointment scheduled for August 22 or August 23, 1996. Ms. Lee did not know the victim was missing at that time. Ms. Lee went to greet Defendant who was accompanied by a woman. Defendant said, "Janet is not here but her best friend so and so [sic] . . . is." Ms. Lee could not remember the woman's name.

Jose Alberto Sandoval Pulido testified that he had practiced law in Guadalajara, Mexico since 1998. Mr. Pulido, his client, Samuel Chavez, and Defendant had a business meeting in Mexico in 2001. Defendant became very angry with Mr. Pulido and Mr. Chavez toward the end of the meeting, and Mr. Chavez and Defendant traded insults. Mr. Pulido stated that Defendant "said that if we did not help him he would do away with us the way he did with his wife." Mr. Pulido and Mr. Chavez left the meeting.

A videotape of Arthur March's deposition which was taken before trial was played for the jury. In his deposition, Mr. March testified that he had entered a plea of guilty in federal court to solicitation to commit murder. Mr. March acknowledged that the Levines were the intended victims of the charged offense. Mr. March was sentenced to eighteen months confinement followed by three years of supervised probation in exchange for his truthful testimony at Defendant's murder trial. Mr. March said that he arrived in Nashville three or four days after the victim disappeared to help Defendant with the children and to attend Samson's birthday party. When he arrived in Nashville, Defendant asked him to dispose of his computer's hard drive and another component of the computer. Mr. March threw the hard drive away in a wooded area, and the other component in a dumpster. Defendant then asked his father to help him dispose of the victim's remains. Mr. March said that he bought a shovel and a bottle of Clorox at a hardware store near Interstate 65. He and Defendant drove to a road near a construction site on property previously owned by Sharon Bell. Mr. March got out of the car, and Defendant drove away. Mr. March followed Defendant's directions by walking ten or fifteen yards and turning left and found the victim's remains in a leaf bag in the spot described by Defendant. Mr. March brushed the dirt off the top of the bag and closed it. He pulled the bag down the hill and waited for Defendant by the side of the road. Defendant drove up, and Mr. March and Defendant put the victim's remains in the trunk. Mr. March stated that he saw some bones in the bag, and the bag weighed approximately fifty or sixty pounds.

Defendant drove north toward Chicago. Defendant stopped at a motel near Bowling Green, Kentucky and Mr. March paid for a room with Defendant's cash. Defendant told his father that he was tired and laid down on the bed. Mr. March took Defendant's car keys and drove to the other side of Bowling Green. He looked for a creek but could not find one that was deep enough to hide the victim's remains. Mr. March pulled to the side of the road as the sun began to rise and noticed a large pile of brush. He cleared away three holes in the brush, and he placed the victim's clothes in the first hole, the victim's remains in the second hole, and the trash bag in the third hole. Mr. March then drove back to the motel, and he and Defendant returned to Nashville. Mr. March said that he and Defendant never discussed the incident again.

Regarding the solicitation of the murder of the Levines, on cross-examination, Mr. March acknowledged that Mr. Farris, whom he knew as "Bobby Givings," telephoned him in Mexico. Mr. March said that Defendant told him that Mr. Farris was "a friend who needed some help." Mr. Farris used code words during the first telephone call so that Mr. March would know that Defendant had approved the call. Mr. March initially said that it was his idea to murder the Levines. Subsequently, he stated that Mr. Farris suggested the plan. Mr. March said that he never discussed with Defendant the details of his telephone conversations with Mr. Farris. Mr. March acknowledged, however, that Mr. Farris told him to send information concerning their conversations to Defendant's sister in Chicago who would download the messages and mail them to Defendant. Mr. March acknowledged that he and Mr. Farris discussed the Levines' schedule, and the plan for Mr. Farris to come to Mexico after the offenses were committed. Mr. March said that he understood from Defendant that he, Mr. March, was to support Mr. Farris in the commission of the offenses.

The taped telephone conversations between Mr. March and Mr. Farris were introduced as exhibits at trial and played for the jury. The two men discussed the daily schedules of Defendant's children and the Levines, the purchase of a gun to commit the offenses, the type of gun to use, and the plan for Mr. Farris to live with Mr. March in Mexico after the offenses. Mr. March warned Mr. Farris to "wear thin surgeon's gloves," and told him, "You do not take them off at all."

Fletcher Bailey Long testified that he represented Arthur March after his indictment in Tennessee for conspiracy to commit first-degree murder, and his indictment in federal court for conspiracy to commit interstate murder-for-hire. Mr. Long said that he and Mr. March were discussing a possible settlement agreement on February 1, 2006, when Defendant entered the room. Defendant said, "Dad, don't roll on me, I'm not going to roll on you." Mr. Long said that Defendant held out his jail jumpsuit and said, "We will wear this as a badge of honor, a badge of honor."

Dr. William M. Bass, a professor emeritus of the University of Tennessee, was allowed to testify as an expert in the field of forensic anthropology. Dr. Bass explained that various factors affect the rate of a body's decomposition including temperature, exposure to sun, and the place the body was buried. Dr. Bass was provided a hypothetical situation in which the body of a one hundred pound, five feet, three inches tall woman is placed in a large leaf bag, open on one end, which is then deposited in a wooded area, lightly covered with dirt, leaves, or debris and not removed for approximately thirty-nine days. Dr. Bass stated that based on those conditions, the decaying process would start on the fifth day and last between fifteen to twenty days. Dr. Bass said that the body would be a skeleton by the end of the third or fourth week, and the bones would weigh between ten and fifteen pounds.

Robert Armstrong, the co-owner of a tire store in Nashville, testified that he sold a set of Michelin tires to Defendant on August 21, 1996, for Defendant's Jeep Cherokee. Before he rang up the sale, Mr. Armstrong inspected the Jeep and discovered that the tires "were in extremely good shape." Defendant told Mr. Armstrong that he wanted Michelin tires instead of the ones currently on the Jeep. Defendant told Mr. Armstrong that he did not want to keep the old tires.

Andrew Saks, a friend of Defendant and the victim, testified that Defendant asked Mr. Saks to help him move on September 18, 1996. Mr. Saks said that Defendant "was very business like and somewhat aggravated" during the move. Mr. Saks said that Defendant's comments "that he wanted to 'F' [sic] the Levines and 'F' [sic] the Nashville police" were "very disturbing." Mr. Saks stated that Defendant did not take up his offer to help Defendant search for the victim.

Robert Heller testified that he has known Defendant since October 1993. In 1997, Defendant asked Mr. Heller to critique a manuscript Defendant had written. The manuscript, which was introduced as an exhibit at trial, portrayed the investigation of the murder of a young, black-haired woman.

Russell Nathaniel Farris testified that he was currently housed in the Davidson County Criminal Justice Center on three counts of attempted first degree murder, one count of aggravated robbery, and one other felony offense not identified in the record. Mr. Farris acknowledged that he had four prior convictions of theft, one conviction for facilitation of robbery, one conviction for reckless endangerment, and one misdemeanor theft conviction. Mr. Farris agreed that he was facing a significant amount of time in confinement if convicted of the pending charges.

Mr. Farris said that he was arrested on his current charges at the end of April 2005 and transferred to the Special Management Unit on the fourth floor of the Criminal Justice Center

at the end of May. Defendant arrived on the fourth floor in August 2005. Mr. Farris said that Defendant came over to talk to him on Defendant's first night in the unit. Defendant asked Mr. Farris about prison life, and Defendant talked about living in Mexico. Mr. Farris stated that Defendant's erroneous belief that Mr. Farris had been charged with first degree murder was because of a computer error.

Mr. Farris said that Defendant would talk to him through a crack in Mr. Farris's cell door during Defendant's recreation period. After numerous conversations, Mr. Farris said that Defendant asked him to kill Carolyn and Lawrence Levine. Defendant told Mr. Farris that he would pay his bond so that Mr. Farris could be released from jail. Defendant intended to raise money for Mr. Farris's bond by selling property in Mexico or possibly through a cash advance for the publication of his manuscript.

Mr. Farris stated that he and Defendant talked on a daily basis for approximately one month. Mr. Farris became concerned that he would be charged with conspiracy, and he told his attorney and mother about his conversations with Defendant. Mr. Farris's attorney scheduled a meeting with police officers and the district attorney general's office after which Mr. Farris agreed to record his conversations with Defendant. Mr. Farris recorded several conversations with Defendant in which the murder of the Levines was discussed. Mr. Farris then told Defendant that he was going to be released on bond. Instead, Mr. Farris was taken to the Williamson County jail. The tape of the recorded conversations was entered as an exhibit at trial and played for the jury.

Before Mr. Farris' transfer, Defendant wrote down a list of code words Mr. Farris was to use when he contacted Arthur March, and gave Mr. Farris Mr. March's telephone number in Mexico and his e-mail address. Defendant wrote the Levines' address at the bottom of the page. After his transfer to Williamson County, Mr. Farris called Arthur March in Mexico approximately five times concerning the plan to murder the Levines.

On cross-examination, Mr. Farris said that when he was supposedly ready to commit the murders, he would tell Arthur March that he was ready "to buy the BMW." Arthur would relay the information to his daughter in Chicago who would then e-mail the information to Defendant. Mr. Farris said that he used the name, "Bobby Givings", when he spoke to Arthur March. Defendant told Mr. Farris, however, that Mr. Farris was to postpone killing the Levines if Defendant got word to Mr. Farris through Arthur March that he was "not ready to sell." Defendant said that it was important for both him and Mr. Farris to be in agreement on the timing of the offenses.

Cornelius King testified that he was arrested in Nashville on October 19, 2005, for first degree murder, and he was housed in the Special Management Unit on the fourth floor

of the Davidson County Criminal Justice Center. Defendant's cell was next to Mr. King's cell. Defendant talked to Mr. King when Defendant was released from his cell for recreation. Defendant talked about his children, his father, and living in Mexico. During one conversation, Defendant told Mr. King that he and the victim had argued over Defendant's infidelity. Defendant said that the victim told him that she was going to obtain a divorce and "take everything." Defendant told Mr. King that he "was not going to allow it to happen." The argument escalated into a physical altercation, and Defendant said that he struck the victim on the head with a wrench. Defendant told Mr. King that he would win his case because he had burned the victim's body and poured the ashes in the lake.

In January 2006, Mr. King was moved to the third floor but was shortly returned to the fourth floor after a confrontation with his co-defendant. Mr. King said that Defendant was suspicious of him after Mr. King returned to the Special Management Unit. Defendant asked Mr. King if he had returned to the fourth floor to elicit more incriminating evidence about Defendant. Mr. King wrote down the substance of the prior conversations with Defendant about the victim's death and passed the note to his lawyer. Mr. King said that Defendant asked him to testify in court against another prisoner, Reno Martin, and Defendant would tell him what to say. Mr. King refused. Defendant then filed a grievance against Mr. King alleging extortion, and Mr. King was moved off the fourth floor.

Reno Martin testified that in October 2005, he was housed at the Criminal Justice Center in the Special Management Unit on the fourth floor following his arrest on a drug charge. Mr. Martin said that his cell was next to Defendant's cell, and Mr. Farris' cell was on the other side. Mr. Martin and Defendant became friends. One day, while the men were taking their recreation on the roof, Mr. Martin noticed that Defendant was "very agitated." Defendant had attended a court proceeding earlier that day concerning the custody of his children. Defendant told Mr. Martin that "it was times like this that he was glad that he wasn't [sic] out with a gun." Mr. Martin stated that Defendant also said "that it should have been them that he had taken care of instead of . . ." Defendant stopped talking before he finished his sentence and "lost his expression on his face." Mr. Martin stated that Defendant "went completely pale, like he couldn't [sic] believe what he just said to me." Mr. Martin said that Defendant "kind of had the deer in the headlight look."

Mr. Martin told federal officers that he believed that Defendant had hired Mr. Farris to kill the Levines. Mr. Martin said that Mr. Farris and Defendant were having private conversations and acting "very secretive." Defendant and Mr. Farris would stop talking if anyone walked by. On one occasion, Mr. Martin overheard Defendant ask someone in an agitated voice on the telephone why some money had not been transferred. Defendant hung up and placed another call. Defendant gave the person on the other end an account number and said that he was to be sure that the money got transferred.

-17-

Mr. Martin and Defendant discussed Mr. Farris' release on bond. Defendant said that he thought Mr. Farris might show up for one court date, but he did not think that Mr. Farris would attend any court dates after that. Defendant said that there was "no telling what [Mr. Farris] might do once he got out and what he might say [Defendant] put him up to." Mr. Martin thought that Mr. Farris was relaying information about Defendant to the FBI although he had no basis for his suspicions. When he told Defendant, Defendant "was very distraught." After Defendant learned about Mr. Farris' cooperation with the investigating officers about the conspiracy to murder the Levines, Defendant asked Mr. Martin to say that he had never seen Defendant and Mr. Farris communicate with each other while Mr. Farris was housed on the fourth floor.

Kevin Carroll, an investigator for the Davidson County Sheriff's Department and a task force officer with the FBI's Violent Crime and Gang Task Force in Nashville, testified that he participated in the investigation of the conspiracy to kill Carolyn and Lawrence Levine. Investigator Carroll arranged for two digital tape recorders to be placed into Nathaniel Farris' cell on October 6, 2005. Investigator Carroll recovered the digital tapes from Mr. Farris during the evening of October 6, 2005. Mr. Farris was then transferred to the Williamson County jail.

Investigator Carroll explained that inmates housed in the Special Management Unit were on "house alone/rec alone" status which meant that Defendant was not allowed out on recreation at the same time as the other inmates. Investigator Carroll said that the fourth floor was under twenty-four hour surveillance, and a redacted copy of the surveillance videotape for the twenty-four hour period from October 6, 2005 to October 7, 2005, was introduced as an exhibit. The video tape shows Defendant walking up and down the corridor between the two rows of cells and then approaching Mr. Farris' cell. A second surveillance videotape, showing Defendant's interaction with Mr. King, was introduced as an exhibit and played for the jury.

Kenneth Sena, a supervisory special agent with the FBI assigned to the Guadalajara, Mexico office, testified that he conducted a surveillance of Arthur March on October 27, 2005, in connection with the investigation of the conspiracy to kill Carolyn and Lawrence Levine. Agent Sena stated that Mr. March left his home that day at approximately 12:30 p.m. and arrived at the Guadalajara International Airport at approximately 1:05 p.m. At approximately 3:00 p.m., Agent Sena approached Mr. March and asked Mr. March why he was at the airport. Agent Sena said that Mr. March appeared "physically shaken" and "turned pale." Mr. March sat down, and Agent Sena gave Mr. March time to catch his breath. Mr. March said that he was at the airport to meet a friend named "Bobby Givings." Agent Sena informed Mr. March that "Mr. Givings" had arrived at the airport but was being detained by immigration officers.

Pat Postiglione, a detective with the Metro Nashville Police Department, testified that he and Detective Bill Pridemore escorted Defendant from Los Angeles to Nashville on August 12, 2005, after Defendant's arrest in Mexico on the murder charge. During the trip to the airport and the flight itself, Detective Postiglione said that Defendant indicated that he wanted to talk. Detective Postiglione told Defendant that he understood that Defendant was an attorney, and told Defendant that he had no intention of interrogating him on the trip, and that Defendant was under no obligation to speak to him. Defendant said that he appreciated the information, but then began to talk. Defendant initially denied killing the victim but said that "he wanted to close this chapter in his life," and "his attorneys would be contacting the police very soon."

Defendant asked Detective Postiglione about the State's evidence against him and whether the victim's body had been found. Defendant asked Detective Postiglione to contact the district attorney general in charge of the case over the weekend. Defendant said he would enter a plea of guilty to the victim's death in exchange for a sentence of between five and seven years. Defendant said, "Prior to the Janet incident, I have not been involved in any other criminal-type activity." Detective Postiglione informed Defendant that he was not authorized to enter into any plea negotiations, but Defendant continued to talk about the case during the approximately three-hour flight. Detective Postiglione said that Defendant mentioned a potential sentence of between five and seven years on several occasions. Defendant asked general questions about medium and minimum security prisons and prison life. Defendant said that he would be "100 percent honest" if a settlement agreement could be reached. Detective Postiglione told Defendant that he could not answer for the District Attorney's office, but he would relay the terms Defendant wanted out of a potential settlement agreement. Defendant also asked hypothetically whether a person would face a second degree murder charge if the death was accidental. Defendant told Detective Postiglione that "he intensely loved Janet," but she was not the angel portrayed in the media.

Detective Postiglione subsequently received information that Mr. Farris had certain information concerning Defendant. Mr. Farris disclosed Defendant's plan to kill Carol and Lawrence Levine during a meeting on October 4, 2005. Detective Postiglione verified that Mr. Farris was housed next to Defendant's cell and that Mr. Farris had placed a telephone call to Mexico on Defendant's behalf. Detective Postiglione said that the fourth floor's surveillance videotape showed lengthy conversations between Defendant and Mr. Farris. Mr. Farris agreed to digitally record any conversations with Defendant which were later downloaded to a compact disc. The compact disc was introduced as a exhibit and played for the jury.

Detective Postiglione stated that Mr. Farris agreed to place five telephone calls to Arthur March on October 12, 14, 20, 25 and 27, 2005. On October 27, 2005, Mr. Farris told

Mr. March that he had murdered the Levines and that he was at the Houston International Airport waiting for his flight to Guadalajara, Mexico. Mr. Farris asked Mr. March to pick him up at the airport. The tapes of the recorded telephone conversations between Arthur March and Mr. Farris were introduced as an exhibit and played for the jury.

Detective Postiglione said that Defendant's residence on Blackberry Road was approximately 4.8 miles from the Brixworth Apartments. A demonstration mountain bicycle ride from Defendant's residence to the Brixworth Apartments took approximately thirty minutes.

Sharon Bell testified that Defendant represented her in 1994 during a real estate transaction. Ms. Bell and her husband, Fred Zimmerman, purchased approximately one hundred acres of undeveloped land on Hillsboro Road north of Old Hickory Boulevard. Ms. Bell said that Defendant reviewed the original plat for the property and physically inspected the property on at least one occasion. The property was purchased and divided into lots. Ms. Bell stated that she talked with Defendant frequently concerning the progress of the property's development. Ms. Bell accepted an offer to purchase Lot No. 2 on September 4, 1996, and the closing was scheduled for October 8, 1996.

The State rested its case-in-chief, and Defendant presented his defense. Robert L. Jackson testified that he had been practicing law since 1965 exclusively in the area of family law including divorces. Mr. Jackson said that Defendant scheduled an appointment with him for August 27, 1996. Mr. Jackson stated that a copy of the list entitled "Janet's 12-day Vacation" was in his file.

Kyle P. Sowell, the chief deputy clerk of the Davidson County Probate Court, testified that Arthur March filed a pleading in the probate court in connection with the probate of the victim's estate on July 30, 1999. The parties entered an agreed upon stipulation that "this pleading alleged in part that Larry Levine killed Janet March, hid his crime completely, and has attempted to deflect the blame from himself and onto his [Arthur's] son, Perry." On cross-examination, Mr. Sowell said that the pleading was neither verified nor notarized, and the issues raised in the pleading were not addressed by the probate court before the case was closed.

David Roh testified that he had been a tire salesperson for approximately twenty-seven years at the same establishment as Robert Armstrong. Mr. Roh said that he sold Defendant four tires for his Jeep Cherokee on August 21, 1996. Mr. Roh stated that it was the store's policy to tell a potential buyer whether or not new tires were actually needed. Mr. Roh said that he did not remember having that conversation with Defendant.

The parties entered an agreed upon stipulation that Defendant leased an apartment in University Square Apartments from Dr. Robert Maddox on August 17, 1996.

Corporal Steve Howard testified that he was a Special Management Unit Officer on the fourth floor of the Criminal Justice Center in 2005. Corporal Howard stated that Cornelius King was housed on the fourth floor from October 21, 2005, until January 6, 2006. On one day during that period, Mr. King asked Corporal Howard if he could move to a different cell because there was a ghost in his cell.

Sergeant Paul Roberts, another supervisor with the Special Management Unit, testified that on one occasion, the faucet in Mr. King's cell was stuck so that the water ran continuously. Sergeant Roberts said that the sink could be accessed from outside the cell. Sergeant Roberts fixed the faucet and then turned the water on and off repeatedly to make sure that it would not stick again. Sergeant Roberts stated that Mr. King became very excited, and Sergeant Roberts explained that he was working on the plumbing to the cell. On cross-examination, Sergeant Roberts stated that Mr. King calmed down when he found out that Sergeant Roberts was the one turning the water on and off.

Corporal Alicia McArthur testified that she worked in the Special Management Unit on the fourth floor of the Criminal Justice Center. Corporal McArthur stated that in March 2006 Defendant filed a complaint against Mr. King after which Mr. King was moved to a different location. On cross-examination, Corporal McArthur said that, according to Defendant's complaint, Mr. King had threatened to have other inmates harm Defendant if Defendant did not give Mr. King his apple pie. Corporal McArthur acknowledged that the threat could not have actually been carried out because Defendant was on "house alone/rec alone" status. Corporal McArthur stated that the substance of the threat was not investigated because no disciplinary report was filed. Corporal McArthur acknowledged that Mr. King was not moved on the day of the reported threat.

Sergeant Sheila Stinson with the Davidson County Sheriff's Department testified that she investigated Mr. King's alleged threat against Defendant. Sergeant Stinson determined that Mr. King needed to be moved because Defendant said that Mr. King had threatened to bodily harm him. On cross-examination, Sergeant Stinson stated that her investigation was limited to talking with Mr. King and Defendant. Sergeant Stinson acknowledged that no inmate would have been able to harm Defendant because of his "house alone/rec alone" status.

A video taped interview of Samson March by a news reporter in May 2000 was entered as an exhibit at trial and played for the jury. In his statement, Samson said that on August 15, 1996, his mother came into his bedroom, gave him a good-night kiss, and told

him that she would be back soon. Samson stated that she had two suitcases with her and was wearing a white shirt and brown velvet slacks. Samson said that he went to his bedroom window and waved at the victim as she drove away, and the victim waved back.

The State called the following rebuttal witnesses. Carolyn Levine testified that only the rooftop of a vehicle leaving the house was visible from Samson's second story bedroom. Ms. Levine stated that Samson had never before said that the victim had told him goodbye on August 15, 1996, or that the victim left the house with a suitcase.

Kim Abbington-Scott testified that she was Samson Levine's kindergarten teacher in 1996. Ms. Abbington-Scott said that Samson was very sad on the first day of school on August 26, 1996. Samson told Ms. Abbington-Scott that his mother had left, and he did not get to tell her good-bye before she left.

Ralla Klepak testified that she was appointed to represent the March children in court proceedings in Chicago. Ms. Klepak stated that Samson told her that he did not know where his mother was, and that the last thing he heard on the night she left was his mother and father arguing downstairs after he had gone to bed. When he went downstairs the next morning, his mother was gone. Ms. Klepak described Samson as "very traumatized and sad."

## ANALYSIS

### I. Suppression of Defendant's August 12, 2005 Statements to Sergeant Postiglione

Defendant argues that the trial court erred in denying his motion to suppress his comments to Detective Postiglione during his transport from Los Angeles to Nashville on August 12, 2005. Defendant submits that the obtaining of these statements violated his constitutional rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and under Article 1, § 9 of the Tennessee Constitution. Defendant also argues that his comments to Detective Postiglione concerning the possibility of entering into plea negotiations were inadmissable under Rule 408 of the Tennessee Rules of Evidence.

Detective Postiglione testified at the suppression hearing that Defendant first initiated a conversation during the drive from the Los Angeles County Jail to the car rental company to return the officer's rental car. Defendant told Detective Postiglione that he (Defendant) had spoken with an attorney while he was housed in the Los Angeles County Jail. Defendant referred to the attorney as "Brent," a college friend. Detective Postiglione told Defendant that he was aware that Defendant was an attorney and advised Defendant that he did not have to speak to the police officers if he did not choose to do so, but that he would listen to any comments or questions Defendant might have.

While they were waiting for Detective Pridemore to turn in the rental car, Defendant said that he appreciated Detective Postiglione's advice and said that his attorneys would soon contact the police department, without further elaboration. Defendant said that "he was ready to close this chapter in his life." Detective Postiglione told Defendant that people often perceived events "one way when, in fact, it is something totally different." Detective Postiglione said that he used "a moment of anger instantly regretted" as an example. As a hypothetical, Detective Postiglione explained to Defendant that there was a "stark difference" between someone killing another person in anger, and someone walking up behind the other person and "shooting them in the back of the head." Defendant did not respond to Detective Postiglione's comment, and the two men only engaged in small talk until they boarded the airplane to go to Nashville.

During the flight, Defendant began questioning Detective Postiglione about the extent of the State's evidence against him and whether the evidence was direct or circumstantial. Despite the fact that Detective Postiglione told Defendant that he could not discuss the evidence with him, Defendant was very persistent with his questions. Defendant asked Detective Postiglione if the police department had located the victim's body and whether they could prove that the victim was dead. Detective Postiglione did not respond.

Defendant "adamantly" denied being involved in the victim's disappearance but began to ask questions about the possibility of a plea agreement with a sentence of between five and seven years. Defendant said that even though he was not guilty, he wanted to avoid the risk that he would be sentenced to thirty years. Detective Postiglione told Defendant that he was not authorized to enter into plea negotiations. Detective Postiglione said that he would listen to what Defendant had to say but told him that only the District Attorney General's Office had the authority to extend a plea offer. Detective Postiglione stated that Defendant said that he was going "to do the high road, do the right thing, be a man, and do his time." Defendant asked Detective Postiglione about prison life and whether he would be placed in "a minimum to medium security situation." Defendant said that "he knew what was best for him, adding that he would be the best attorney in the room." Defendant stated that he was not being arrogant, "just honest."

Detective Postiglione told Defendant that if a settlement agreement could be reached, Defendant would be required to answer specific questions as part of the process. Defendant replied, "OK [sic], [y]ou tell Tom Thurman that if we can work out a deal, I will answer all of their questions completely and honestly and be one hundred percent truthful." Defendant mentioned plea negotiations several times during the flight and asked Detective Postiglione to speak with the District Attorney General over the weekend instead of waiting until Monday.

Defendant said that "it would be easier on the police department, the District Attorney's Office, his own family, and the Levine family if it didn't [sic] go to trial." Defendant stated that a plea of guilty would bring closure to the Levine family. Defendant asked if a convicted felon could practice law after prison, and Detective Postiglione responded that he did not know. Defendant asked Detective Postiglione if the District Attorney's Officer would help bring his wife, Carmen, to the United States because she was not an American citizen. Defendant again stated that he would accept a sentence of between five and seven years in connection with the entry of a plea of guilty. Defendant said that before the "Janet incident," he had not been involved in any criminal activities.

The men changed flights in Memphis for the final leg of the journey. Defendant commented, "We are just two men having a cordial conversation." Defendant gave Detective Postiglione the names and telephone numbers of his attorneys in Nashville. After their arrival in Nashville, and as Defendant was walking to the police booking room, Detective Postiglione told Defendant that he hoped that Defendant "would continue to think about the things that he [Defendant] had said on the plane." Detective Postiglione stated that Defendant "stopped walking, pointed his finger toward his face, and said, 'Look at me, you've got my word!'"

On cross-examination, Detective Postiglione acknowledged that he did not provide Defendant with a verbatim *Miranda* warning because he did not intend to interrogate Defendant about the case. Detective Postiglione stated that he only responded to Defendant's questions during the trip and did not himself ask any questions. Detective Postiglione acknowledged that he hoped that Defendant would engage in conversation during the flight, and that he encouraged questions and comments from Defendant. Detective Postiglione stated, however, that the topics of their conversations surprised him. Detective Postiglione said that the conversations lasted approximately two hours with periodic breaks while Defendant napped, read a magazine, and ate a snack.

At the conclusion of Detective Postiglione's testimony, the State introduced as an exhibit without objection the transcript of a deposition of Defendant taken on October 15, 1996, in a civil case related to the Levines' request for grandparent visitation. During the deposition, Defendant invoked his Fifth Amendment Right not to incriminate himself more than seventy times when questioned about the victim's disappearance and the events leading up to and immediately after August 15, 1996. The State also introduced as an exhibit without objection Detective Postiglione's written summary of his conversations with Defendant on August 12, 2005, which he prepared when the men arrived back in Nashville.

The trial court found Detective Postiglione's testimony credible. The trial court found that nothing in Detective Postiglione's written summary of the conversation on August 12,

2005, or his testimony at the suppression hearing indicated that Defendant was subjected to custodial interrogation or its functional equivalent under the principles of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966) or *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682 (1980), and that the obtaining of his statements was not in violation of Defendant's constitutional privilege against self-incrimination.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. Nevertheless, appellate courts will review both questions of law and the trial court's application of law to the facts purely *de novo*. *See State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23.

We first address Defendant's contention on appeal that the trial court "conspicuously declined" to address his argument that his conversation with Sergeant Postiglione violated his Sixth Amendment right to counsel. In his motion to suppress, Defendant alleged that both his Fifth and Sixth Amendment rights were violated by the taking of his statements on August 12, 2005. However, Defendant's arguments in his motion to suppress and at the suppression hearing were based solely on *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966) and *State v. Sawyers*, 156 S.W.3d 531 (Tenn. 2005), both Fifth Amendment cases. The trial court, although referencing the Sixth Amendment in its order denying Defendant's motion to suppress, applied a Fifth Amendment analysis without addressing Sixth Amendment principles and concluded that Defendant was not subject to custodial interrogation or its functional equivalent within the guidelines of the Fifth Amendment.

Nonetheless, in his motion for new trial, Defendant argued that the admission of his August 12, 2005, statements violated his Sixth Amendment right to counsel as outlined in *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199 (1964) and *State v. Berry*, 592 S.W.2d 553 (Tenn. 1980). In its order denying Defendant's motion for new trial, the trial court stated without specificity that it had again reviewed its factual findings in light of *Massiah* and *Berry* and found no Sixth Amendment violation. *See Montejo v. Louisiana*, __ U.S. __, 129 S. Ct. 2079, 2090 (2009) (finding that because the right to counsel under both the Fifth and Sixth Amendments "is waived using the same procedure, . . . doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver); *Patterson v. Illinois*, 487 U.S. 285, 292-93, 108 S. Ct. 2389, 2395

(1988) (concluding that a determination of whether a defendant has waived his right to counsel under either the Fifth or the Sixth Amendment draws upon the same factual findings).

The trial court made extensive factual findings concerning the circumstances surrounding the giving of Defendant's statements on August 12, 2005, and the record has been sufficiently developed to permit review on appeal of Defendant's challenge to the admissibility of his statements under both the Fifth and Sixth Amendments.

## A.  Fifth Amendment Right to Counsel

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."  Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9.  Thus, a suspect has the right to have counsel present during a custodial interrogation. *Miranda*, 384 U.S. at 460-72, 86 S. Ct. at 1625-26. Once a suspect invokes his right to counsel under the Fifth Amendment, he or she "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1884-85 (1981).  The *Miranda* court held that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612 (footnote omitted).  "Custodial interrogation" for Fifth Amendment purposes includes not only express questioning, but also its "functional equivalent" which is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1690-91 (1980).

However, the *Miranda* court also explained that:

[i]n dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible.  Confessions remain a proper element of law enforcement.  Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.  The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.  There is no requirement that police stop a

person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth amendment and their admissibility is not affected by our holding today.

*Miranda*, 384 U.S. at 478, 86 S. Ct. at 1630.

Defendant argues that his statement to Detective Postiglione that he "felt that his attorneys would be contacting the police again" was an unequivocal invocation of his right to counsel, and that Detective Postiglione's hypothetical example concerning the difference between an accidental killing and a premeditated killing was the functional equivalent of interrogation in violation of his Fifth Amendment rights.

There is no question that Defendant was in custody. However, Detective Postiglione testified that he did not intend to interrogate Defendant during the flight from Los Angeles to Nashville. Defendant was so informed and advised of his right to remain silent. (We note that according to the deposition introduced as an exhibit at the suppression hearing, Defendant invoked his Fifth Amendment privilege against self-incrimination over seventy times thus illustrating his familiarity with his right to remain silent.) Defendant's comment that his attorneys would be contacting the police soon, on its face, is not an unequivocal request to deal with the police only through counsel. Defendant, an attorney himself, was clearly aware that he had the right to counsel. He had already spoken to counsel in California and had retained counsel in Tennessee before he was returned to this State. Defendant provided the names and telephone numbers of his attorneys to Detective Postiglione during the flight. At no time, however, did Defendant during the trip express any desire not to talk to Detective Postiglione until his counsel was present, and the record does not support Defendant's contention that he felt coerced to talk.

On the contrary, Defendant continued to initiate conversations with Detective Postiglione over a two-hour period, falling quiet only to eat or nap. Defendant appeared very focused on his own agenda which was to find out as much as possible about the State's evidence against him and whether a plea agreement with a short sentence was possible. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045-1046, 103 S. Ct. 2830, 2835 (1983) (concluding that the defendant's question, "Well, what is going to happen to me now?" evinced "a willingness and desire for a generalized discussion about the case" and "was not merely a necessary inquiry arising out of the incidents of the custodial relationship"); *State v. Land*, 34 S.W.3d 516, 524 (Tenn. Crim. App., 2000) (observing that "[i]t is well established that questioning initiated by the defendant is not interrogation in the *Innis* [446 U.S. 291, 100 S. Ct. 1682 (1980)] sense") (citing *Edwards*, 451 U.S. at 484, 101 S. Ct. at 1885)).

Although a police officer should refrain from making a comment designed to elicit a response from a defendant, including comments which minimize the crime with which the defendant is charged, the *Edwards* Court explained:

> [i]f, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will do or say something that clearly would be interrogation. In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with authorities.

*Edwards*, 451 U.S. at 486, 101 S. Ct. at 1885.

Although an officer's intent may be relevant in determining "whether the officer should have known his or her words or actions were reasonably likely to invoke an incriminating response," the primary focus rests "upon the accused's perception rather than on the police officer's intent." *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005) (citing *Innis*, 446 U.S. at 301, 100S. Ct. at 1690). In the case *sub judice*, Defendant observed that "we are just two men having a conversation." Defendant said that although he did not trust Detective Postiglione because he was a police officer, he found that Detective Postiglione "might be an honorable man." At the conclusion of the flight, Defendant stated that he was glad that it was Detective Postiglione who had been assigned to escort him back to Tennessee, that he had no complaints, and that Detective Postiglione had treated him well. The record does not support Defendant's contention that he felt that he was being subject to interrogation during the flight.

Based on our review of the totality of the circumstances surrounding the giving of Defendant's statements, we conclude that the evidence does not preponderate against the trial court's finding that the admission of Defendant's August 12, 2005, statements did not violate Fifth Amendment principles. Defendant is not entitled to relief on this basis.

B. Sixth Amendment Right to Counsel

"Once a defendant is formally charged with an offense, however, the State is no longer merely engaged in the task of determining who committed an unsolved crime; rather, it is preparing to convict the defendant of the crime he allegedly committed." *Michigan v. Harvey*, 494 U.S. 344, 364, 110 S. Ct. 1176, 1188 (1990). Once judicial proceedings have been initiated, a defendant is protected by the Sixth Amendment which states that "[i]n all

criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI; *Brewer v. Williams*, 420 U.S. 387, 398, 97 S. Ct. 1232, 1239 (1977). "In Tennessee, the Sixth Amendment right to counsel attaches with the initiation of criminal charges through an arrest warrant, a preliminary hearing (if no arrest warrant is issued), or an indictment or presentment (when the charge is initiated by the grand jury)." *State v. Turner*, – S.W.3d –, 2010 WL 987076, at *12 (Tenn. 2010) (citing *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980)).

Defendant was indicted for the charged offenses on December 4, 2004. He was arrested in Mexico on August 3, 2005, and transported to the Los Angeles County Jail for extradition proceedings. At the time that Sergeant Postiglione arrived in California to escort Defendant back to Tennessee on August 12, 2005, judicial proceedings had been initiated and Defendant's Sixth Amendment right to counsel had attached. Defendant invoked his Sixth Amendment right to counsel by retaining counsel in Tennessee before he was returned to this state on August 12, 2005.

After the initiation of formal charges, the Sixth Amendment guarantees the accused "the right to rely on counsel as a medium between himself and the State in any critical confrontation with state officials." *State v. Downey*, 259 S.W.3d 732, 733 (Tenn. 2008). Police initiated interrogation by the State after charges are filed is considered a "critical stage" of the criminal proceedings. *Powell v. Alabama*, 287 U.S. 45, 57, 53 S. Ct. 55, 59-60 (1932) (citing *Massiah v. United States*, 377 U.S. 201, 204-05, 84 S. Ct. 1199, 1201-02 (1964)). After the invocation of the right to counsel, the admission of a defendant's incriminating statements deliberately elicited by police officers in the absence of the defendant's attorney violates Sixth Amendment principles. *Michigan v. Harvey*, 494 U.S. 344, 349, 110 S. Ct. 1176, 1179 (1980); *Brewer*, 430 U.S. at 405, 97 S. Ct. 1232; *Massiah*, 377 U.S. at 206, 84 S. Ct. at 1203 (1964).

That is not to say, however, that a defendant cannot waive his Sixth Amendment right to counsel. *Montejo v. Louisiana*, __ U.S. __, 129 S. Ct. 2079, 2085 (2009). As the *Montejo* Court observed:

[o]ur precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. *Patterson v. Illinois*, 487 U.S. 285, 292, n. 4, 108 S. Ct. 2389 (1988); *Brewer v. Williams*, 430 U.S. 387, 404, 97 S. Ct. 1232 (1977); *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019 (1938). The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. *Michigan v. Harvey*, 494 U.S. 344, 352-353, 110 S. Ct. 1176 (1990).

*Id*. For Sixth Amendment purposes, "[t]he U[nited] S[tates] Supreme Court has clearly sanctioned the admissibility of a statement given after the appointment of counsel and even after defendant has 'expressed his desire to deal with police only through counsel,' where defendant initiates further communication, electing 'to face the state's officers and go it alone,' and knowingly and intelligently waives his Sixth Amendment right to counsel. *State v. Cauthern*, 778 S.W.2d 39, 46 (Tenn. 1989) (quoting *Patterson v. Illinois*, 487 U.S. 285, 108 S. Ct. 2389 (1988); *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880 (1981)); *see also Oregon v. Bradshaw*, 462 U.S. at 1045, 103 S. Ct. at 2834.

Because "a Sixth Amendment violation does not depend upon coercion, the protection of the Sixth Amendment is not waived by conduct that shows only that a defendant's statements were not coerced." *Wyrick v. Fields*, 459 U.S. 42, 54, 103 S. Ct. 394, 400 (1982). Therefore, "[t]he State must show that the defendant intelligently and knowingly relinquished his right not to be questioned in the absence of counsel. The State can establish a waiver only by proving 'an intentional relinquishment or abandonment' of the right to have counsel present." *Wyrick*, 459 U.S. at 54, 103 S. Ct. at 400 (citing *Brewer*,430 U.S., at 404, 97 S. Ct., at 1242, quoting *Johnson,* 304 U.S. at 464, 58 S. Ct. at 1023).

Defendant argues that the record is devoid of any indication that he intentionally relinquished his Sixth Amendment right to counsel. Relying on *Massiah* and *State v. Berry*, 592 S.W.2d 553 (Tenn. 1980), Defendant contends that Sergeant Postiglione impermissibly and deliberately elicited incriminating statements from him during the flight.

Both the *Massiah* court and the *Berry* court were presented with similar situations. Each defendant in the two cases had been indicted and had retained counsel. An undisclosed agent of the State (a co-defendant in *Massiah* and a disguised Tennessee Bureau of Investigation agent in *Berry*) approached the respective defendant at the direction of law enforcement officials and engaged him in conversation during which each defendant made incriminating statements concerning his current charges. *Massiah*, 377 U.S. at 202-03 84 S. Ct. at 1201; *Berry*, 592 S.W.2d at 555-56. The *Massiah* Court concluded that the defendant "was denied the basic protections of that guarantee [the Sixth Amendment right to counsel] when there was used against him at his trial evidence of his own incriminating statements, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206; 84 S. Ct. at 1203; *Berry*, 592 S.W.2d at 561 (concluding that the eliciting of defendant's incriminating statements under the circumstances presented violated the defendant's Sixth Amendment right to counsel). As the *Berry* court observed, "[t]he law will not permit law enforcement officials to do by ruse, trickery, deceit and deception that which it is not permitted to do openly and honestly." *Id*.

In *Massiah* and *Berry*, the statements made by each defendant were voluntary. However, the disguise of the true identity of the federal agent in *Massiah* and the role of the co-defendant in *Berry* rendered any purported waiver of the right to counsel unknowing. *See United States v. Henry*, 447 U.S. 264, 273, 100 S. Ct. 2183, 2188 (1988) (concluding that "the concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of [post-indictment] communications with an undisclosed undercover informant acting for the Government").

In the case *sub judice*, however, Defendant clearly understood that Sergeant Postiglione was a police officer assigned to his case. Defendant had previously demonstrated that he understood his right to remain silent during his deposition in a civil case, and Sergeant Postiglione warned Defendant that he had the right to remain silent as soon as Defendant initiated the first conversation on the way to the car rental company. Defendant also knew that he had the right to have his counsel present during any interrogation, but he chose to "go it alone" and enter into a generalized discussion of his case with Sergeant Postiglione. *Bradshaw*, 462 U.S. at 1045, 103 S. Ct. at 2834. Based on our review, we conclude that Defendant voluntarily, knowingly, and intelligently waived his Sixth Amendment right to counsel. Defendant is not entitled to relief on this basis.

Defendant submits that even if it is found that he waived his Sixth Amendment right to counsel, such waiver is presumed invalid under *Michigan v. Jackson*, 475 U.S. 625, 106 S. Ct. 1404 (1986), *overruled in part by Montejo v. Louisiana*, __ U.S. ___, 129 S. Ct. 2079, 2091 (2009). In *Jackson*, two defendants were arrested and arraigned for a variety of offenses. Each defendant requested the assistance of counsel at the arraignment hearing. However, after reading each defendant his *Miranda* rights, the investigating officers initiated an interrogation before either defendant had the opportunity to consult with their respective counsel, during which each defendant made incriminating statements. *Jackson*, 475 U.S. at 627, 106 S. Ct. at 1406-07. Citing *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880 (1981), the *Jackson* court held "that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Jackson*, 475 U.S. at 636, 106 S. Ct. at 1411; *see Edwards*, 451 U.S. at 484-485, 101 S. Ct. at 1884-1885) (concluding that an accused who is in custody, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police").

However, in *Montejo*, the United States Supreme Court revisited the *Jackson* rule, that is, "whether courts must *presume* that such a waiver [of an accused's Sixth Amendment right to counsel] is invalid under certain circumstances." *Montejo*, 129 S. Ct. at 2085 (emphasis

in original). In *Montejo*, the defendant was charged with first degree murder at a preliminary hearing and was appointed counsel. Later that day, two police detectives read the defendant his *Miranda* rights, and the defendant accompanied them on a search for the murder weapon. During the excursion, the defendant wrote an inculpatory letter of apology to the victim's widow which was admitted into evidence at trial over his objection. *Id*. at 2082. The Louisiana Supreme Court affirmed the defendant's conviction, concluding that the defendant at no time had requested or asserted his Sixth Amendment right to counsel, and his subsequent waiver was knowingly, voluntarily and intelligently made. *Id*. at 2083 (citing *State v. Montejo*, 974 So. 2d 1238, 1262 (La. 2008).

On appeal, the defendant argued that the trial court erred in not finding the letter inadmissible under *Michigan v. Jackson*. In beginning its analysis, the *Montejo* court observed that:

> *Jackson* represented a "wholesale importation of the *Edwards* rule into the Sixth Amendment." *Cobb*, [532 U.S.] at 175, 121 S. Ct. 1335. The *Jackson* Court decided that a request for counsel at an arraignment should be treated as an invocation of the Sixth Amendment right to counsel "at every critical stage of the prosecution," 475 U.S., at 633, 106 S. Ct. 1404, despite doubt that defendants "actually inten[d] their request for counsel to encompass representation during any further questioning," *id*., at 632-633, 106 S. Ct. 1404, because doubts must be "resolved in favor of protecting the constitutional claim," *id*., at 633, 106 S. Ct. 1404. Citing *Edwards*, the Court held that any subsequent waiver would thus be "insufficient to justify police-initiated interrogation." 475 U.S., at 635, 106 S. Ct. 1404. In other words, we presume such waivers involuntary "based on the supposition that suspects who assert their right to counsel are unlikely to waive that right voluntarily" in subsequent interactions with police. *Harvey*, *supra*, at 350, 110 S. Ct. 1176.

*Montejo*, 129 S. Ct. at 2086.

The *Montejo* court noted that the fact that:

> the doctrine established by *Miranda* and *Edwards* is designed to protect Fifth amendment, not Sixth Amendment, rights. But that is irrelevant. What matters is that these cases, like *Jackson*, protect the right to have counsel during custodial interrogation – which right happens to be guaranteed (once the adversary judicial process has begun) by *two* sources of law. Since the right under both sources is waived using the same

procedure, *Patterson*, [487 U.S.] at 296, 108 S. Ct. 2389, doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver.

*Montejo*, 129 S. Ct. at 2090. Accordingly, the *Montejo* court overruled *Jackson* to the extent that *Jackson* concluded that a subsequent waiver of the Sixth Amendment right to counsel is presumed invalid. The *Montejo* court remanded the case to determine if the defendant's waiver was knowing and voluntary under both Sixth Amendment and Fifth Amendment principles. *Id*. at 2092.

Defendant argues, however, that although *Montejo* overruled *Jackson* for federal constitutional purposes, our supreme court in *State v. Downey*, 259 S.W.3d 723 (Tenn. 2008) adopted *Jackson* for purposes of Tennessee's constitution. In *Downey*, the defendant was arrested for especially aggravated robbery, conspiracy to commit especially aggravated robbery, aggravated burglary, theft, and attempted first degree murder. *Id*. at 731. After his arrest, the defendant observed that he had "intended to turn himself in after he got an attorney." *Id*. at 732. The defendant was read his *Miranda* rights after he arrived at the police station. The defendant waived his rights and confessed to committing the charged offenses. The defendant filed a motion to suppress his statement prior to trial which was denied by the trial court. *Id*. at 731.

On appeal, the defendant argued that he had made an unequivocal request for counsel during the drive to the police station, and that the admission of his statement violated both Fifth and Sixth Amendment principles. As for the defendant's protections under the Sixth Amendment, our supreme court noted that "[u]nlike the Fifth Amendment, under the Sixth Amendment, the accused need not make an unequivocal request for counsel to invoke the right. *See Michigan v. Jackson*, 475 U.S. 625, 633, 106 S. Ct. 1404 (1986). A presumption exists that the accused requests the services of counsel at every *critical stage* of the prosecution. *Id*." *Downey*, 259 at 733. However, and notwithstanding *Jackson*'s admonition that any waiver of counsel after the adversary procedure has commenced is invalid, the *Downey* court also noted that "[t]he waiver of an accused's right to counsel after receiving *Miranda* warnings, or their equivalent, will generally suffice to establish a knowing and intelligent Sixth Amendment waiver of right to counsel, thus permitting the introduction of post-arrest statements." *Id*. (citing *Patterson*, 487 U.S. at 292-93, 108 S. Ct. 2389).

Citing *Patterson*, our supreme court concluded that:

[a]s stated previously, the defendant never requested assistance of counsel. The trial court found that the mention by the defendant to the arresting officer that he had intended to turn himself in after getting an attorney was not an

invocation of his right, and we hold that the evidence does not preponderate against that conclusion. Additionally, the defendant waived any [Sixth Amendment] right that had attached by signing the waiver after receiving the *Miranda* warnings.

*Downey*, 259 S.W.3d at 733 (citing *Patterson*, 487 U.S. at 292-93, 108 S. Ct. 2389).

Nonetheless, the facts and circumstances presented in *Jackson*, *Montejo*, and *Downey* are clearly distinguishable from those in the case *sub judice*. Each of the cited cases concerned a police-initiated interrogation of a defendant whose Sixth Amendment right to counsel had attached and the interrogation was without the presence of counsel. In this case, Defendant was the one who initiated the conversations with Detective Postiglione. Neither *Jackson*, *Montejo*, nor *Downey* concluded that *an accused*, as in the case *sub judice*, may not initiate post-indictment conversations with police officers concerning his or her case, and voluntarily, knowingly, and intelligently waive his or her Sixth Amendment right to counsel. *See e.g. Montejo*, 129 S. Ct. at 2085 (concluding that "[o]ur precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as that relinquishment of that right is voluntary, knowing, and intelligent"); *Jackson*, 475 U.S. at 627 (concluding that waivers are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis); *Downey*, 259 S.W.3d at 733 (finding no unequivocal request for counsel during a police-initiated interrogation). Defendant is not entitled to relief on this issue.

### C. Rule 408 of the Tennessee Rules of Evidence

Defendant argues that even if he voluntarily waived his Fifth and Sixth Amendment right to counsel, his statements to Detective Postiglione concerning a possible plea agreement were inadmissible pursuant to Rule 408 of the Tennessee Rules of Evidence. Defendant acknowledges that Detective Postiglione was not authorized by the District Attorney General's Office to enter into plea negotiations on behalf of the State as is required by Rule 410 of the Tennessee Rules of Evidence before such evidence is inadmissible. Defendant submits, however, that an accused's plea discussions with someone other than the prosecuting attorney or the prosecuting attorney's agent during a criminal prosecution are still inadmissible pursuant to Rule 408.

Rule 408 provides that "[e]vidence of (1) furnishing or offering to furnish or (2) accepting or offering to accept a valuable consideration in compromising or attempting to compromise a claim, whether in the present litigation or related litigation, which claim was disputed or was reasonably expected to be disputed as to either validity or amount, is not admissible to prove liability for or invalidity of a civil claim or its amount or a criminal

charge or its punishment." Tenn. R. Evid. 408. Defendant argues that an indictment is a "claim" for purposes of Rule 408, and the potential length of imprisonment he faces represents a "valuable consideration in compromising or attempting to compromise" the charges against him.

Both rules of evidence concern the admissibility of settlement negotiations at trial. Rule 410 addresses the admissibility of settlement negotiations in a criminal case in a civil or criminal proceeding. Tenn. R. Evid. 410; *see State v. Hinton*, 42 S.W.3d 113, 122 (Tenn. Crim. App. 2000) (noting that only statements made to the prosecuting attorney or the prosecuting attorney's agent will be inadmissible under Rule 410). Rule 408, on the other hand, addresses the admissibility of settlement negotiations regarding a *civil* claim in a civil or criminal proceeding. Tenn. Rule Evid. 408 (emphasis added); *see* Neil P. Cohen, et al., *Tennessee Law of Evidence* §4.08[2], at 4-146 (5th ed.2005) (observing that "Rule 408 encourages settlements in civil cases by excluding some evidence generated in negotiations" while "Rule 410 accomplishes the same objective in criminal cases by excluding certain evidence in criminal plea negotiations and proceedings"). As Professor Cohen points out, "Rule 410 differs from [Rules 408 and 409] by applying to negotiations in criminal cases." *Id*. §4.10[2], at 4-158. Defendant's argument that any statements concerning a possible plea agreement made by an accused to anyone, whether an agent of the State or not, ignores the different focuses of Rules 408 and 410 and would render Rule 410 superfluous.

Based on our review, we conclude that the trial court did not err in finding that Defendant's statements to Detective Postiglione concerning the possibility of a plea negotiation were not inadmissible under Rule 408 of the Tennessee Rules of Evidence. Defendant is not entitled to relief on this issue.

## II. Admission of Defendant's Statements to Nathaniel Farris

Defendant argues that the trial court erred in denying his motion to suppress Mr. Farris' testimony about the conspiracy to murder Carolyn and Lawrence Levine. Relying on *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199 (1964) and *State v. Berry*, 592 S.W.2d 553 (Tenn. 1980), Defendant contends that Mr. Farris' statements were deliberately elicited in violation of his Sixth Amendment right to counsel. Citing *United States v. Hoffa*, 385 U.S. 293, 87 S. Ct. 408 (1966) and *Texas v. Cobb*, 532 U.S. 162, 121 S. Ct. 1335 (2001), the State submits that Defendant's Sixth Amendments rights had not yet attached to the then uncharged conspiracy offense, and nothing in Defendant's conversations with Mr. Farris directly implicated him in the indicted offenses of second degree murder, tampering with evidence, or abuse of a corpse. The State argues, therefore, that the testimony did not violate Defendant's Sixth Amendment right to counsel as to the indicted offenses and was relevant as to Defendant's identity as the perpetrator of the charged offenses under Rule 404(b) of the

Tennessee Rules of Evidence. In his reply brief, Defendant challenges the State's assertion that Mr. Farris' statements were unrelated to the indicted offenses citing *United States v. Bender*, 221 F.3d 265 (1st Cir. 2000). Defendant submits that if, as the State argues on appeal, his statements to Mr. Farris were not incriminating as to the indicted offenses, then the challenged testimony would not be relevant to any material issue at trial and thus are inadmissible under Rule 404(b).

We first address Defendant's argument under Rule 404(b) of the Tennessee Rules of Evidence. Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity at a certain time. Tenn. R. Evid. 404(a). In other words, a party may not use character evidence to show that a person acted in a particular way because he or she had a propensity to do so. *State v. Moore*, 6 S.W.3d 235, 239 (Tenn. 1999); *State v. Parton*, 694 S.W.2d 299, 304 (Tenn. 1985) (observing that evidence of another crime is not admissible to show that the defendant is the kind of person who would tend to commit the offense); *State v. Tizard*, 897 S.W.2d 732, 743 (Tenn. Crim. App. 1994) (noting that character evidence may not be used to show a propensity to act).

In addition, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). The following conditions must be satisfied before allowing such evidence:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

While evidence of a prior crime, wrong, or act is not admissible to prove that a defendant had the propensity or disposition to commit the crime, it may be relevant and admissible to prove issues such as identity, intent, motive, opportunity, or absence of mistake or accident. *See State v. Shropshire*, 45 S.W.3d 64, 75 (Tenn. Crim. App. 2000). Where the

trial court has been called to pass upon the admissibility of evidence of other crimes, wrongs, or acts under Rule 404(b), its determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). *State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005) (citing *State v. DuBose,* 953 S.W.2d 649, 652 (Tenn. 1997)).

Prior to Mr. Farris' testimony, the trial court conducted a Rule 404(b) hearing to determine the relevance of the proffered evidence. At the conclusion of the hearing, the trial court found that evidence concerning a conspiracy to murder the State's witnesses was relevant to the identity of the perpetrator of the charged offenses, and probative as "both inconsistent with [a] claim of innocence and evidencing a consciousness of guilt." *See State v. Austin,* 87 S.W.3d 447, 477 app. (Tenn. 2002) (citations omitted) (holding that "[g]enerally, evidence of threats against witnesses attributed to the accused is probative as being either (1) conduct inconsistent with the accused's claim of innocence or (2) conduct consistent with the theory that the making of such threats evinces a consciousness of guilt"); *Tillery v. State*, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978) (citations omitted) (concluding that "[a]ny attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred").

On appeal, Defendant concedes the relevancy of the conspiracy evidence in his murder trial but contends that its probative value was substantially outweighed by its unfair prejudice, the effect of which Defendant describes as "monumental." As this Court has previously recognized, however, "[a]ny evidence which tends to establish the guilt of an accused is highly prejudicial to the accused, but this does not mean that the evidence is inadmissible as a matter of law." *State v. Dulsworth* 781 S.W.2d 277, 287 (Tenn. Crim. App. 1989). Rather, to be inadmissible, the evidence must be *unfairly* prejudicial. "[T]he mere fact that evidence is particularly damaging does not make it unfairly prejudicial." *State v. Gentry*, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993). Rather, evidence which is unfairly prejudicial is that which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. *See State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Thus, this Court has determined that evidence should not be admitted when its primary purpose "is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Collins* 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998).

The decision to admit or exclude evidence on the basis of relevancy is generally left to the trial court's discretion. *See State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002). As alluded to by the trial court, because the victim's body was never found, the State would be required to prove the identity of the perpetrator and the *corpus delecti* by circumstantial evidence. The trial court found that the challenged evidence was "highly probative" and went "directly to the defendant's consciousness of guilt and could tend to negate any claim

of innocence made by him." The trial court found that the probative value of Mr. Farris' testimony was not outweighed by its prejudice. Based on our review, we conclude that the trial court did not abuse its discretion in finding the evidence of the conspiracy to murder Mr. and Mrs. Levine admissible under Rule 404(b) of the Tennessee Rules of Evidence. Defendant is not entitled to relief on this issue.

However, even if evidence is relevant under Rule 404(b), the manner in which the evidence is obtained by the State may violate a defendant's Sixth Amendment right to counsel. As noted previously, once a defendant's Sixth Amendment right to counsel has attached, the State may not directly or indirectly obtain incriminating statements from a defendant concerning the charged offense outside the presence of the defendant's counsel unless the defendant voluntarily and knowingly waives his right to counsel. *Harvey*, 494 U.S. at 349, 110 S. Ct. at 1179; *Brewer*, 430 U.S. at 405, 97 S. Ct. at 1232; *Massiah*, 377 U.S. at 206, 84 S. Ct. at 1203. Incriminating statements concerning an indicted offense obtained in violation of the Sixth Amendment are not admissible in a trial of the offense for which the defendant has been formally charged at the time the statements were made. *See Massiah*, 377 U.S. at 206, 84 S. Ct. at 1203. On the other hand, a defendant's voluntary statements concerning a crime for which he or she has not yet been charged are not afforded Sixth Amendment protection. Such statements are admissible in a subsequent trial of the previously *uncharged* offense because the Sixth Amendment right to counsel had not yet attached to the uncharged offense. *Cobb*, 532 U.S. at 173, 121 S. Ct. at 1344. What is not specifically addressed in these United States Supreme Court opinions is whether an indicted defendant's voluntary statements about a separate offense for which he or she has not been formally charged are admissible, if relevant, in the trial of the indicted offenses. *See State v. Tony Wayne Snyder*, No. 03C01-9403-CR-00101, 1995 WL 687581 (Tenn. Crim. App., at Knoxville, Nov. 21, 1995), *perm. to appeal denied* (Tenn. May 13, 1996).

The issue is whether Defendant's statements to Mr. Farris which incriminate Defendant in the murder of Janet March, but do not include comments directly about the homicide of Janet March, were obtained in violation of the Sixth Amendment.

After the United States Supreme Court's decisions in *Massiah* and *Brewer*, the Tennessee Supreme Court reviewed a Sixth Amendment challenge to statements elicited by an undercover agent of the Tennessee Bureau of Investigation (T.B.I.) in *State v. Berry*, 592 S.W.2d 553 (Tenn. 1980). In *Berry*, T.B.I. agent David Rhea was assigned a false identity with fabricated charges and was placed in the same jail as the defendant, who had been accused of the first degree murder of his father-in-law, John Shanks. *Id*. at 555. Agent Rhea's goal was ostensibly to secure information concerning possible threats by the defendant against the State's witnesses in the upcoming murder trial. The defendant began conversing with Agent Rhea, whom he knew as "Turnblazer," and told Agent Rhea that he

wanted to find someone to kill two T.B.I. agents involved in the investigation of his case. Agent Rhea told the defendant that he would kill the agents in exchange for $10,000, and the defendant suggested that Agent Rhea use dynamite to accomplish the offenses. *Id.* at 556. During their conversations, the defendant also made several incriminating statements concerning the charged offense of the murder of Mr. Shanks although he stopped short of admitting that he had killed Mr. Shanks. *Id.*

On the basis of the record, the court concluded:

> (1) that defendant was indicted for first degree murder; (2) that he was given *Miranda* warnings; (3) that he employed counsel; (4) that the law enforcement officials knew he was represented by counsel; (5) that he was confined in the Greeneville City Jail; (6) that Agent Rhea of the Tennessee Bureau of Investigation, posing as a captured felon, was placed in jail with him; (7) that defendant, believing him to be a "tough character," and not having any idea or suspicion of his true identity, initiated a conversation with him; (8) that during the course of this conversation numerous incriminating statements were made; (9) that Rhea did not interrogate him in the conventional sense, but did engage in general conversation during the course of which he asked questions and received answers; and (10) that there was no waiver of his right to counsel.

*Id.* at 561. Our supreme court concluded that the trial court erred in not suppressing the defendant's statements to Agent Rhea relating to the charged offense of first degree premeditated murder. Also significant to the court was the paucity of proof at trial which supported the State's assertion that Agent Rhea was placed in the jail to prevent harm to the State's witnesses in the murder trial, rather than to elicit incriminating statements about the murder. Therefore, the court concluded that "no parts of this interrogation may be presented to the jury on retrial." *Id.*

After the decision in *Berry* was issued, the United States Supreme Court clarified that the Sixth Amendment right to counsel is "offense specific." *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207 (1991). That is, a defendant's invocation of his or her right to counsel as to an indicted offense is not an invocation of the right to counsel in future prosecutions. *Id.* In *McNeil*, the defendant was arrested pursuant to a warrant for an armed robbery which had been committed in West Allis, Wisconsin. While in custody, the defendant waived his *Miranda* rights and confessed to the offenses of murder, attempted murder, and armed robbery which he had committed in Caledonia, Wisconsin. The defendant sought to suppress his confession in the trial of the Caledonia offense, arguing that once his right to counsel attached as to his West Allis offense, any subsequent waiver of his

right to counsel regarding other offenses, including the Caledonia offenses, was invalid. *Id.* 501 U.S. at 174-75, 111 S. Ct. at 2207. The Supreme Court disagreed concluding that "[b]ecause petitioner provided the statements at issue here before his Sixth Amendment right to counsel with respect to the *Caledonia offenses* had been (or even could have been) invoked, that right poses no bar to the admission of the statements in this case." *Id*. at 176, 111 S. Ct. at 2208 (emphasis in original).

After *McNeil*, the United States Supreme Court, in *Texas v. Cobb*, 532 U.S. 162, 121 S. Ct. 1335 (2001), rejected the defendant's argument that the Sixth Amendment's right to counsel included all offenses which were "factually related" to the indicted offenses. In *Cobb*, Lindsey Owings reported to the Walker County, Texas, Sheriff's Office that his home had been burglarized and his wife and daughter were missing. The defendant was developed as a suspect and confessed to committing the burglary at the Owings residence. However, he denied any knowledge of the whereabouts of Ms. Owings and her daughter. The defendant was subsequently indicted for burglary and counsel was appointed to represent him. *Id.* at 165, 121 S. Ct. at 1339. While free on bond, the defendant confessed to his father that he had killed Ms. Owings and the child, and his father then contacted police. The defendant was taken into custody and given *Miranda* warnings. He waived his *Miranda* rights and confessed the murders to police. At his murder trial, the defendant sought to suppress his confession arguing that his Sixth Amendment right to counsel had attached to all of the offenses because they arose out of the same criminal transaction. *Id*. at 166, 121 S. Ct. at 1340. The United States Supreme Court observed that some state courts and Federal Courts of Appeal have interpreted "*McNeil*'s offense-specific definition" to include a defendant's "crimes that are 'factually related' to a charged offense." *Id*. at 168, 121 S. Ct. at 1340 (footnote omitted). However, the court once again cautioned that the Sixth Amendment right to counsel is offense specific and attaches only to charged offenses and other "offenses that, even if not formally charged, would be considered the same offense" under the test enunciated in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180 (1932). *Cobb*, 532 U.S. at 169, 121 S. Ct. at 1341.

The trial court in the case *sub judice* relied on *Cobb* and *State v. Tony Wayne Snyder*, in finding Defendant's incriminating statements concerning the conspiracy to kill the Levines admissible in his murder trial. The *Cobb* decision, however, although reiterating that the Sixth Amendment right to counsel is offense specific, did not address the admissibility in that case of the defendant's confessions to the "uncharged" murder offenses (which, in this case, is that of conspiracy to murder the Levines) during the trial on the "charged" offense of burglary (which, in this case, is that of the murder of Janet March). *See Cobb*, 532 U.S. at 173, 121 S. Ct. at 1344 (concluding that the defendant's confessions to the murders of Ms. Owing and her daughter were admissible in the *murder* trial) (emphasis added).

In *Tony Wayne Snyder*, the defendant was charged with conspiracy to commit first degree murder, aggravated arson, and theft over $1,000 after he set fire to his girlfriend's mother's house and left the scene with his girlfriend in her mother's car. The defendant confessed to the offenses after being advised of his *Miranda* rights. *Tony Wayne Snyder*, 1995 WL 687581, at \*1. Before trial, Philip Denton, an inmate at the jail, told a police officer at the jail that the defendant had asked Mr. Denton to testify that the defendant's confession was coerced. Mr. Denton also reported that the defendant had made threats against the law enforcement officials involved in the case and their families. *Id*. at \*2. Arrangements were made for the taping of the defendant's conversations with Mr. Denton. In one taped conversation, the defendant offered Mr. Denton three packs of cigarettes and two dollars to testify falsely, and in another he offered three cigarettes and forty cents. *Id*. At his trial, the State introduced the taped conversations over the defendant's objection. The defendant argued on appeal that the introduction of this evidence violated his Sixth Amendment right to counsel.

The court observed that although the defendant's Sixth Amendment rights had attached as to the conspiracy, arson, and theft offenses, "that right had not yet evolved as to subornation of perjury because no adversarial proceedings had been initiated." *Id*. (citing *Massiah*, 377 U.S. at 206). The *Tony Wayne Snyder* court also observed that the United States Supreme Court in *Maine v. Moulton*, 474 U.S. 159, 106 S. Ct. 489 (1985) "did not make clear whether evidence of the separate crime, where relevant, would be admissible in the trial on the prior charges wherein the defendant's Sixth Amendment rights had already attached." 1995 WL 687581, at \*3 (citing *Moulton*, 474 U.S. at 179-180, 106 S. Ct. at 489). Based upon its review, the court concluded that the admission of the tapes into evidence did not violate the defendant's Sixth Amendment right to counsel. The court found that:

> Here, the tape-recorded statements of the defendant did not include any information about the crimes with which he had already been charged. The defendant was not directly incriminated by the content. From all outward appearances, the purpose of the "wire" was to corroborate evidence of his attempt to get Denton to falsely testify. Thus, the admission of the statements, evidence of the defendant's guilt of a separate offense, did not compromise his right to counsel on the initial charges.

*Id*. at \*4 (citing *Greico v. Meachum*, 533 F.2d 713, 717 (1ˢᵗ Cir. 1976).

Defendant points out in his brief that *Greico* has subsequently been abrogated in the First Circuit. *See United States v. Bender*, 221 F.3d 265 (1st Cir. 2000) (citing *United States v. Lozada-Rivera*, 177 F.3d 98, 107 (1st Cir. 1999). In *Bender*, the defendant was arraigned on the charge of being a felon in possession of a firearm, and was assigned counsel. *Bender*, 221 F.3d at 267. While incarcerated, the defendant discussed with two fellow inmates a

scheme to fabricate an alibi for the charged offense, and a plot to kidnap and murder the government's witnesses. *Id.* The inmates reported the plots to government agents, and an undercover officer was placed in the jail to meet with the defendant, who thought he was meeting his hired alibi. *Id.* The defendant made incriminating statements about the alibi and kidnapping plots but not about the charged firearm possession offense. The First Circuit Federal Court of Appeals concluded that the eliciting of incriminating statements by the undisclosed government agent concerning the defendant's plot to fabricate an alibi and to possibly kidnap and murder government witnesses, although not directly incriminating as to the indicted offense of felon in possession of a weapon, were indirectly incriminating by showing "'that a guilty mind was at work'" and therefore obtained in violation in the defendant's Sixth Amendment right to counsel. *Id.* at 269 (quoting *U.S. v. Lozada-Rivera*, 177 F.3d 98, 107 (1999)).

Nonetheless, the *Tony Wayne Snyder* court also relied on *United States v. Moschiano*, 695 F.2d 236 (7th Cir. 1982) which arrived at a different conclusion than the *Bender* court. In *Moschiano*, the Seventh Circuit Court of Appeals concluded that post-indictment statements concerning a separate crime which did not refer to the charged offense may be introduced, if relevant, in a trial on the charged offenses. *Id.* at 241; *see also United States v. Merritts*, 527 F.2d 713, 716 (7th Cir. 1975) (observing that *Massiah* "applies to incriminating statements about past conduct obtained after indictment through the equivalent of police interrogation . . . [and] does not confer immunity for utterances, such as Merritts' solicitation of a bribe, which are not statements about past conduct but constitute criminal acts in themselves").

Defendant argues that despite these conflicting views, our supreme court's decision in *Berry* follows the analysis reflected in *Bender*, that is, that all post-indictment statements by an accused under indictment concerning other crimes which have not yet been charged must be excluded from the trial on the indicted offense to which Sixth Amendment rights have attached. The State submits that *Berry* was issued before the United States Supreme Court's guidance in *Mouton* and *Cobb*. The State also points out that one of the factors of significance to the *Berry* court is not present in the case *sub judice*, that is, there is no evidence in the record that using Mr. Farris to obtain more information about the conspiracy plot was merely a ruse by the State to encourage incriminating statements from Defendant about the charged offenses. *See Moschiano*, 695 F.2d at 242-243 (quoting *United States v. Anderson*, 523 F.2d 1192, 1195-96 (5th Cir. 1975)) (observing that "post-indictment evidence [which] was not the product of an ongoing investigation but rather was a 'special single-shot confrontation . . . arranged . . . to obtain from the defendant evidence of specific intent to shore up the government's case'" is not admissible at the trial on the indicted charges).

In *State v. Berry*, however, our supreme court specifically stated that it "predicat[ed] this holding on the Sixth Amendment to the Constitution of the United States, made applicable to the states by the Fourteenth Amendment." *Berry*, 592 S.W.2d at 561. In *State v. Webb*, 625 S.W.2d 281 (Tenn. Crim. App. 1980), this Court also reviewed a Sixth Amendment challenge to the admission at trial of incriminating jailhouse statements made by a defendant to his nephew in front of an undercover agent who had been placed in the defendant's cell in order to procure information concerning the defendant's role in the charged offenses of rape and murder. *Id*. at 283-84. Relying on *Massiah* and *Brewer*, and citing *Berry* as analogous to the defendant in *Webb*, we concluded that the statements "were deliberately elicited by action of the state" in violation of the defendant's Sixth Amendment right to counsel. *Id*. at 284. Therefore, we find the opinion in *Tony Wayne Snyder*, in which this Court followed federal law without citing *Berry*, very persuasive.

Accordingly, based on our review, we conclude that the admission of Defendant's statements to Mr. Farris concerning the as yet uncharged conspiracy to kill the Levines in his trial for the murder of Janet March did not violate Defendant's Sixth Amendment right to counsel.

However, based on the facts present in the case *sub judice*, we conclude that even if the admission of this testimony was error, such error was harmless beyond a reasonable doubt. Mr. Farris testified that he and Defendant talked on a daily basis for approximately one month before Mr. Farris disclosed the conversations to police officers and agreed to tape record his conversations with Defendant. Thus, before Mr. Farris acted on behalf of the State in gathering information about the conspiracy, Defendant made several incriminating statements to Mr. Farris including his request that Mr. Farris kill Carolyn and Lawrence Levine and his plan to obtain Mr. Farris' release on bond so that he could commit the offenses. A defendant's statements to a third party, "both written and oral, are admissible, subject to exclusion only by other rules of evidence." Tenn. R. Evid. 803(b)(3); *State v. Lewis*, 235 S.W.3d 136, 145 (Tenn. 2007) (citing *State v. Binion*, 947 S.W.2d 867, 874 (Tenn. Crim. App. 1996); Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.06 [3][a], at 8-47). Nor does the United States Constitution provide protection for those who voluntarily offer information to a confident. *Claridy v. State*, 522 S.W.2d 759, 768 (Tenn. Crim. App. 1976) (citing *Hoffa v. United States*, 385 U.S. 293, 87 S. Ct. 408 (1966)). Thus, Defendant's statements to Mr. Farris before Mr. Farris became an agent of the State were admissible. *See Hartman v. State*, 896 S.W.2d 94, 100 (Tenn. 1995) (concluding that "[a]ny admissions made by the [defendant] before law enforcement officials became involved would of course be admissible") (citing *Moulton*, 474 U.S. at 176, 106 S. Ct. at 487).

The conversations which were taped after Mr. Farris became an agent for the State provided details of the conspiracy including the type of weapon to be used, various code

words to be used by Mr. Farris when speaking with Arthur March, and the location where the offenses would occur. Both Defendant and the State presented other evidence at trial concerning these details. The conspiracy plot against the Levines was first placed before the jury during Arthur March's cross-examination, the video tape of which was played for the jury before Mr. Farris testified. Mr. March testified on cross-examination that Mr. Farris, using the name "Bobby Givings," initiated contact with him using code words given to him by Defendant. Mr. March said that the code words were a signal to him that Mr. Farris had talked to Defendant and that Mr. March was to talk to Mr. Farris. According to Mr. March, it was Mr. Farris who first suggested killing the Levines. Mr. Farris and Mr. March discussed purchasing a gun with a silencer, the Levines' schedules, and Mr. Farris' plan to stay with Mr. March in Mexico after the killings. Mr. March told Mr. Farris that he did not want to know the details of the plan, but he acknowledged that he did not tell Mr. Farris "to stop." Mr. March denied that Defendant knew any of the details of the conspiracy. However, Mr. March acknowledged that Mr. Farris told him to send "information" to Defendant's sister by email who would then print out the emails and mail them to Defendant.

The State also introduced into evidence the tapes of the telephone conversations between Arthur March and Mr. Farris during Sergeant Postiglione's direct examination without objection. These tapes provide further details concerning the conspiracy including how and where the offenses should occur, the purchase of a weapon and silencer, the use of multiple vehicles or license plates, and Mr. Farris' flight to Mexico after committing the offenses. In *Hartman*, our supreme court concluded that the admission of statements obtained in violation of a defendant's Sixth Amendment rights by an informant acting on behalf of the State was harmless error beyond a reasonable doubt where the State presented other evidence concerning the substance of the inadmissible statement, and the informant's testimony before he became an agent of the state, which was admissible at trial, corroborated the details of the defendant's inadmissible statements. *Hartman*, 896 S.W.2d at 100-01.

Based on our review, we conclude that the introduction of the tapes of Defendant's conversations with Mr. Farris did not affect the outcome of the trial beyond a reasonable doubt. *See State v. Ely*, 48 S.W.3d 710, 725 (Tenn. 2001). The victim disappeared from her residence on August 15, 1996. Arthur March testified that Defendant killed the victim, and buried her body on vacant land near his residence. Mr. Rodman testified that Defendant was in the parking lot of the Brixworth Apartments, where the victim's vehicle was later found, at approximately 1:00 a.m. on August 16, 1996, with his mountain bike. Mr. March helped Defendant move the victim's body from Tennessee to Kentucky. Mr. March located the garbage bag which Defendant said contained the victim's remains by following Defendant's directions. Mr. March said that the garbage bag contained bones and scraps of clothing. Mr. March and Defendant drove to Kentucky where Mr. March found a new burial spot for the victim's remains while Defendant waited in a motel room. Mr. March, also at Defendant's

-44-

request, discarded the hard drive of Defendant's computer and poured bleach, at Defendant's request, over the gravel in front of the residence's back door. Defendant admitted to Mr. Pulido during an argument in 2001 that "he did [away] with his wife." Defendant also told Mr. King that he, Defendant, had killed the victim during an argument over his infidelity by striking her on the head with a wrench. Defendant confided to Mr. Martin that he should have killed the Levines, but stopped short of saying "instead of the victim."

Based on our review and the facts and circumstances presented in the case *sub judice*, we conclude that even if Mr. Farris' testimony about statements made after Mr. Farris agreed to tape record the conversations were obtained in violation of Defendant's Sixth Amendment right to counsel, such error was harmless beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

## III.  Admission of Leigh Reames' Testimony

Defendant argues that the trial court erred in admitting Ms. Reames's testimony concerning her allegation of sexual harassment against Defendant in 1991. Defendant also objects to the admission of two of his letters to Ms. Reames in 1991, and the letter dated August 13, 1996, addressed to Ms. Reames, as exhibits at trial. Defendant submits that any connection between these events and the victim's disappearance was "too remote in time" and "tenuous, at best" to be relevant to any material issue at trial. Citing *State v. Bordis*, 905 S.W.2d 214 (Tenn. Crim. App. 1995), Defendant further contends that evidence of his prior misconduct was improper lifestyle evidence which served only to inflame the jury to his detriment. Defendant argues, therefore, that the probative value, if any, of evidence of his "tawdry conduct toward a female co-worker" was outweighed by its prejudicial effect.

At the conclusion of the offer of proof involving Ms. Reames's testimony, the trial court found that the evidence of Defendant's outstanding debt to Ms. Reames was relevant to the jury's consideration of motive in that it supported the State's theory that Defendant and his wife had been arguing, in the days and weeks prior, over Defendant's debt to Ms. Reames and the circumstances giving rise to the debt. *See* Tenn. R. Evid. 401, 402. The trial court found that although the debt was initially incurred in 1992, Defendant's letter to Ms. Reames requesting an extension of time in which to make the balloon payment was dated August 13, 1996, and postmarked August 16, 1996, the day after the victim disappeared. The court reasoned that the evidence of the debt was necessary to explain the letters sent by Defendant to Ms. Reames, which were the cause of some marital strife between Defendant and his wife, possibly giving Defendant a motive for the murder. The trial court found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403.

The trial court also conducted a Rule 404(b) analysis as to the testimony concerning Defendant's infatuation with Ms. Reames, although the trial court expressed its doubt that this evidence was propensity evidence. *See id*. 404(b). The trial court found that proof of the basis for the sexual harassment allegations was clear and convincing because Defendant stipulated at trial that he wrote the letters to Ms. Reames. The trial court found that Ms. Reames' testimony was relevant to motive and to corroborate indirectly Mr. King's testimony that Defendant told him that he (Defendant) had killed the victim during an argument over Defendant's marital infidelities. Even though the prior acts were committed approximately five years before the victim's disappearance, Dr. Campbell's testimony during cross-examination showed that the victim was angry over Defendant's conduct with Ms. Reames between approximately ten and fourteen days before her disappearance. Based on these findings, the trial court found that the probative value of Ms. Reames' testimony was not substantially outweighed by the danger of unfair prejudice.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Once the trial court concludes the evidence is relevant, the court should exclude the evidence if its probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 403; *State v. James,* 81 S.W.3d 751, 757 (Tenn. 2002). A trial court's decision as to the relevance of evidence under Rule 401 will be reversed only upon a showing of abuse of discretion. *State v. Powers,* 101 S.W.3d 383, 395 (Tenn.2003). A trial court's exercise of discretion will not be reversed on appeal unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck,* 953 S.W.2d 662, 669 (Tenn.1997).

As noted above, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. The evidence may be relevant and admissible, however, to prove issues such as identity, intent, motive, opportunity, or absence of mistake or accident. Tenn. R. Evid. 404(a) and (b); *see State v. Shropshire,* 45 S.W.3d 64, 75 (Tenn. Crim. App. 2000). Where the trial court has been called to pass upon the admissibility of evidence of other crimes, wrongs, or acts under Rule 404(b), its determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). *State v. Thacker,* 164 S.W.3d 208, 240 (Tenn. 2005) (citing *State v. DuBose,* 953 S.W.2d 649, 652 (Tenn. 1997)).

As reflected in his letter to Ms. Reames dated August 16, 1996, Defendant had failed to make the final balloon payment as required by the settlement agreement with Ms. Reames dated February 19, 1992, but in his letter he assures Ms. Reames that he will do so by

October 1, 1996. This evidence does not reflect propensity evidence as contemplated by Rule 404(a)(1) and Rule 404(b) of the Tennessee Rules of Evidence. *See* Black's Law Dictionary 232 (6th ed. 1990) (defining character evidence as "[t]he aggregate of the moral qualities which belong to and distinguish an individual person"). That is, the fact that Defendant was behind in his settlement payments as reflected in the August 13, 1996, letter, whatever character trait might be drawn from this act, was not offered to prove that Defendant committed murder because he had a propensity to do so. *See* Neil P. Cohen, et al., Tennessee Law of Evidence, §404.2 (3rd ed. 1995) (noting that "character evidence cannot be used to prove that a person did a certain act because the person had a propensity to commit it").

Thus, the admissibility of this evidence is governed by Rules 401 and 403 of the Tennessee Rules of Evidence. "Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence." *State v. James*, 81 S.W.3d, 751, 757 (Tenn. 2002); *see also White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn Ct. App. 1999) (noting that exclusion under Rule 403 is "an extraordinary remedy that should be used sparingly").

In his civil deposition on November 11, 1996, which was introduced as an exhibit at trial, Defendant testified that the arrangement with Ms. Reames was not a "problem" in his marriage. Defendant said that he told the victim about the situation "a couple of years ago," and that the settlement payments would not affect the household finances. Defendant acknowledged that he and the victim discussed the matter in February or March of 1996 and again in June or July of 1996. The State's theory was that the victim was angry over the incident with Ms. Reames and the financial obligation attached to it a few days before her murder, and that these incidents indicated the presence of marital strife in August, 1996.

Based on the foregoing, we conclude that the trial court did not abuse its discretion in finding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Defendant is not entitled to relief on this basis.

As for Defendant's conduct toward Ms. Reames, the trial court complied with the requirements of Rule 404(b) by finding that there was clear and convincing evidence of the prior act, that the evidence was relevant to the issue of motive, and that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(1)-(4); *see State v. DuBose,* 953 S.W.2d 649, 652 (Tenn. 1997) (concluding that when a trial court substantially complies with the requirements of Rule 404(b), we review its determination under an abuse of discretion standard).

At the hearing, the trial court found that although the sexual harassment allegations occurred in 1991, the evidence presented thus far at trial showed, according to Dr. Campbell's testimony on cross-examination, that Defendant's conduct concerning Ms. Reames was on the victim's mind within approximately ten to fourteen days of her murder, and that the incident made her very angry. Defendant's typewritten letters to Ms. Reames were found among the victim's personal effects after Defendant had removed all of his personal property from the residence. The letters were in an envelope bearing the logo of a company that only the victim used, and the victim's name was handwritten on the envelope. Ms. Reames testified during the offer of proof that the letters in this envelope were the original of the second and third letters she received from Defendant. Ms. Levine testified that the victim had an appointment on August 16, 1996, with an attorney to discuss the filing of a complaint for divorce. Mr. King testified that Defendant told him that he killed the victim during an argument over Defendant's marital infidelities. Based on these factors, we conclude that the trial court did not abuse its discretion in finding that Ms. Reames' testimony and the corresponding exhibits was relevant.

Defendant argues that even if relevant, his prior misconduct with Ms. Reames served only to inflame the jury, and, therefore, any probative value the evidence might have was outweighed by the danger of unfair prejudice. *See State v. Bordis*, 905 S.W.2d 214 (Tenn. Crim. App. 1995). In *Bordis*, the defendant was convicted of the first degree premeditated murder of his infant son who died from malnutrition and dehydration. *Id*. at 218. Prior to trial, the defendant sought to exclude certain portions of his statement to the investigating officers concerning his frequenting of bars catering to the homosexual community and specific details of various types of sexual activities he engaged in on those nights. The State argued that the evidence was relevant to show that the defendant, who left the victim and his three-year-old brother home alone while he and his wife went out, had "complete contempt" for the two children, and the evidence was generally relevant to the elements of first degree murder. *Id*. at 430.

This Court found that the evidence of the defendant's prior sexual misconduct was character evidence, and the defendant had not placed his character at issue. Nor were the sexual acts admissible under Rule 404(b) of the Tennessee Rule of Evidence because they did not show a motive or design to starve the victim to death. *Id*. at 231. Moreover, the Court observed that the defendant's statements could have been redacted to omit the specific sexual details while still allowing proof of the defendant's disregard of the safety of his children when he left them home alone at night.

In the case *sub judice*, unlike the situation presented in *Bordis*, the evidence of Defendant's prior infatuation with Ms. Reames was relevant to show a motive for the victim's death and thus admissible under Rule 404(b). The trial court noted that the letters

had two or three sentences which could be considered as sexual in nature. For the most part, however, Defendant's letters reflected only his rambling thoughts about Ms. Reames, their future together, his instructions on how Ms. Reames was to communicate with him at the law firm, and then his sadness and embarrassment when she disclosed the letters to her employer. The letters clearly did not reach the level of graphic sexual description contained in *Bordis* which this Court found had "infiltrated" that trial. *Bordis*, 905 S.W.2d at 232.

Based on our review, we conclude that the trial court did not abuse its discretion in finding that the probative value of the evidence of Defendant's prior relationship with Ms. Reames was not outweighed by the danger of unfair prejudice. Defendant is not entitled to relief on this issue.

## IV. Admission of the Draft of Defendant's Novel

Defendant argues that the trial court erred in allowing the State to introduce a draft of a novel which Defendant sent to Mr. Heller by email for his critique in 1997. Defendant contends that the draft, which concerns the murder of a small, dark-haired woman, had no probative value as to any material issue at trial, and, if it did, the prejudicial effect of the evidence was far greater than its probative value. The State argues that Defendant has waived consideration of this issue because he failed to object to the introduction of the draft at trial and failed to provide appropriate references to the record in his brief on appeal. *See* Tenn. R. App. P. 36(a) (providing that appellate court need not grant relief where complaining party "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); Tenn. R. App. P. 27(a)(7) (requiring briefed arguments to include "appropriate references to the record").

We agree. At trial, Mr. Heller testified, without objection from Defendant, that Defendant had sent him a draft manuscript of a novel for his critique by email in 1997. The State moved for introduction of the manuscript as an exhibit at trial without objection. The State also moved for the introduction of a separate excerpt from the manuscript to be introduced as an exhibit, again without objection. The State informed the trial court that defense counsel had received a copy of the manuscript and excerpt, and defense counsel did not respond. Based on the foregoing, we conclude that Defendant has waived this issue for purposes of appellate review. *See* Tenn. R. App. P. 36(a). In addition, based on our review of the context of the entire trial, we conclude that the admission of this evidence, even if error, was harmless error. *See* Tenn. R. App. P. 36(b). Defendant is not entitled to relief on this issue.

## V. Tolling of the Statute of Limitations

In addition to second degree murder, Defendant was charged with abuse of a corpse, a Class E felony, and tampering with evidence, a Class C felony. *See* T.C.A. §§ 39-17-312(b), 39-16-503. Prosecution for a Class E felony must be commenced within two years and within four years for a Class C felony. *Id*. § 40-2-101(b)(4), (b)(3). However, "no period . . . during which the party charged was not usually and publicly resident within the state, is included in the period of limitation." *Id*. § 40-2-103.

Relying on *State v. Sliger*, 846 S.W.2d 262 (Tenn. 1993), Defendant argues that the tolling statute set forth in Tennessee Code Annotated section 40-2-103 impermissibly interfered with his constitutional right to travel. Defendant submits that as a result of the application of section 40-2-103, he had to answer to all three charges whereas had he remained in Tennessee he would have only had to answer to the charge of second degree murder.

Our supreme court has concluded that statutes of limitation must be "liberally construed in favor of a criminally accused." *State v. Henry*, 834 S.W.2d 273, 276 (Tenn. 1992.) Further, "[e]xceptions that extend the limitation period, such as a provision tolling the statute during periods of concealment, are to be strictly construed against the state." *Id*. (citations omitted).

Both the United States Supreme Court and the Tennessee Supreme Court have found that the "[f]reedom to travel throughout the United States has been recognized as a basic right under the constitution." *Dunn v. Blumstein*, 405 U.S. 330, 338, 92 S. Ct. 995, 1001 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 629-30, 89 S. Ct. 1322, 1399 (1969); *Knowlton v. Board of Law Examiners*, 513 S.W.2d 788, 790-91 (Tenn. 1978). Thus, a "State may neither tax nor penalize a citizen for exercising his right to leave one State and enter another." *Jones v. Helms*, 452 U.S. 412, 418-19, 101 S. Ct. 2434, 2439 (1981); *see also Saenz v. Roe*, 526 U.S. 489, 500, 119 S. Ct. 1518, 1525 (1999) (concluding that the constitutional right to travel includes "the right of a citizen of one state to enter and leave another state"). A statute that unreasonably burdens the right to travel is subject to strict scrutiny and will be struck down "unless shown to be necessary to promote a compelling governmental interest." *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 262, 94 S. Ct. 1076 (1974).

In *State v. Sliger*, our supreme court addressed a right to travel challenge to Tennessee Code Annotated section 39-15-101 which provides in pertinent part:

(a) a person commits the crime of nonsupport who fails to provide support which that person is able to provide and knows he has a duty to provide to a minor child or to a child or spouse who, because of physical or mental disability is unable to be self-supporting.

. . .

(d) A person commits the offense of flagrant nonsupport who:

(1) Leaves or remains without the state to avoid a legal duty to support.

. . .

(e) Nonsupport under subsection (a) is a Class A misdemeanor. Flagrant nonsupport under subsection (d) is a Class E felony.

*Sliger*, 846 S.W.2d at 263.

The defendant in *Sliger* was a resident of Texas and had never lived in Tennessee. The defendant's wife moved from Texas to Tennessee and was later granted a divorce in this State. After unsuccessful attempts to enforce the Tennessee trial court's order of child support in Texas under the Uniform Reciprocal Enforcement of Support Act, the defendant was indicted for felony flagrant nonsupport in Tennessee under Tennessee Code Annotated section 39-15-101(d)(1). *Sliger*, 846 S.W.2d at 263. The State argued that the phrase "or remains without the state" supported the indictment because of "the defendant's continuing presence in Texas, the state of his domicile." *Id*. at 264.

The *Sliger* decision, however, is not helpful to Defendant's argument. The supreme court concluded that application of the felony flagrant nonsupport statute to a nonresident, nonsupporting defendant who had never lived in nor visited Tennessee discriminated "against the exercise of the constitutional right to travel, which includes the right to select a domicile." *Id*. at 264. The court therefore "construe[d] the felony provision of the statute as applying only to a *resident* nonsupporting parent who compounds the misdemeanor offense of omission (nonsupport) with an action of commission, i.e. 'leaves or remains without the state to avoid a legal duty of support.'" *Sliger* 846 S.W.2d at 265; *see Helms*, 452 U.S. at 419, 101 S. Ct. at 2440) (emphasis added) (recognizing the validity and benefit of state statutes that increase the criminal penalties for parents who commit the offense of nonsupport within a state and then flee that state). That is, a resident's right to travel is not infringed when the resident commits the offense in Tennessee and then leaves the State.

In *Helms*, the United States Supreme Court upheld a similar Georgia statute against a right to travel challenge. *Helms*, 452 U.S. at 413, 101 S. Ct. at 2437. The Georgia statute at issue, like Tennessee's statute as interpreted by *Sliger*, provided that parents who abandoned a child in Georgia and then left the state would be guilty of a felony while a parent who remained in Georgia after abandonment of a child would be guilty of a misdemeanor. *Id*. The *Helms* court noted that:

> [d]espite the fundamental nature of this right [to travel], there nonetheless are situations in which a State may prevent a citizen from leaving. Most obvious is the case in which a person has been convicted of a crime within a State. He may be detained within that State, and returned to it if he is found in another State. Indeed, even before trial or conviction, probable cause may justify an arrest and subsequent temporary detention. Similarly, a person who commits a crime in a State and leaves the State before arrest or conviction may be extradited following "a summary and mandatory executive proceeding." *Michigan v. Doran*, 439 U.S. 282, 288, 99 S. Ct. 530, 535 (1978). Manifestly, a person who has committed an offense against the laws of Georgia may be stopped at its borders and temporarily deprived of his freedom to travel elsewhere within or without the State. *Edwards v. California*, 314 U.S. 160, 184, 62 S. Ct. 164, 172 (1941) (Jackson, J., concurring) [(noting that the right to travel is not unlimited and, for example, "a fugitive from justice [may not] claim freely to migrate unmolested")].

*Id*. 452 U.S. at 419, 101 S. Ct. at 2440. Therefore, a resident who has committed a criminal offense in his or her home state which is punishable by imprisonment does not have "an unqualified right to leave the jurisdiction." *Id*., 452 U.S. at 420, 101 S. Ct. at 2441 (citing *Scherling v. Superior Court of Santa Clara County*, 22 Cal. 3d 493, 501, 149 Cal. Rptr. 597, 585 P.2d 219, 223-24 (1978)).

The Supreme Court determined that Georgia had a compelling interest in requiring parents to support their children and concluded that the legislature's determination that "abandonment within the State followed by departure is a more serious offense than mere abandonment" did not impermissibly infringe on the defendant's right to travel. *Id*. 452 U.S. at 423, 101 S. Ct. at 2442.

Also instructive is *Scherling v. Superior Court of Santa Clara County*, which was cited by the *Helms* court. In *Scherling*, several burglaries were committed in Santa Clara County in 1966 and 1967. *Scherling*, 585 P.2d at 497. The defendant's involvement in these burglaries was not discovered for several years after he had moved to Coeur d'Alene, Idaho in July 1969. *Id*. at 498. When he left California, the defendant provided the Santa Clara

post office with a forwarding address, listed his name in the Coeur d'Alene telephone directory, and did not attempt to hide his identity. *Id*. The defendant's participation in the 1967 and 1968 burglaries was discovered in 1974 after the defendant was investigated for burglaries committed in Idaho. The defendant was arrested after he returned to Santa Clara County in February 1976. *Id*.

The defendant challenged the tolling statute as an impermissible infringement of his right to travel. He argued that the three-year statute of limitations applicable to a burglary offense should not be tolled during his absence from the state. The defendant contended that he was not fleeing prosecution at the time he left the state, that no arrest warrant had been issued, and the police knew or should have known of his whereabouts.

The *Scherling* court found that:

there is clearly a distinction between one who, like defendant, leaves the state after committing a crime, resulting in the tolling of the statute of limitations during his absence, and one who has committed no crime but is deprived of a government benefit merely because he exercises his right to travel to another state. In the former circumstance, the state has an interest in assuring that the defendant is available locally not only to enhance the possibility of detection but also to avoid the burdens of extradition proceedings, should he be charged, his whereabouts become known, and he refuses to return voluntarily.

*Scherling*, 585 P. 2d at 223-24; *see also Montejo*, 129 S. Ct. at 2089 (observing that the state has a "'compelling interest in finding, convicting, and punishing those who violate the law'") (quoting *Moran v. Burbine*, 475 U.S. 412, 426, 106 S. Ct. 1135, 1143 (1986)); *Commonwealth v. George*, 717 N.E.2d 1285, 1290 (Mass. 1999) (noting that the State's interest in detecting and prosecuting crime "is sufficient to justify whatever restriction the tolling provision places on a defendant's qualified right to leave the State")).

Defendant had only a qualified constitutional right to travel because he committed crimes in Tennessee and then chose to leave the State. *Helms*, 452 U.S. at 421, 101 S. Ct. at 2441. During the time of his residence outside the State, Defendant was aware that the investigation of the victim's disappearance was ongoing, and that he was the focal point of that investigation. Based on our review, we conclude that the State's interest in detecting crime and punishing offenders is compelling, and the tolling of the statute of limitations for prosecution of the offenses of abuse of a corpse and tampering with evidence after Defendant's departure from the State is rationally related to that interest. Defendant is not entitled to relief on this issue.

Defendant also submits generally that the tolling statute denies nonresidents their constitutional right to equal protection of the laws. *See* U.S. Const. Amend. 14. "The equal protection provisions of both the federal and state constitutions demand that persons similarly situated be treated alike." *Lanier v. Rains*, 229 S.W.3d 656, 666 (Tenn. 2007) (citing *Tenn. Small Sch. Sys. v. McWherter*, 815 S.W.2d 139, 152 (Tenn. 1993)). "Equal Protection analysis requires strict scrutiny of a legislative classification only when the classification interferes with the exercise of a 'fundamental right" (e.g., right to vote, right of privacy), or operates to the peculiar disadvantage of a 'suspect class' (e.g. alienage or race)." *State v. Tester*, 879 S.W.2d 823, 828 (Tenn. 1994). Defendant does not contend that he is a member of a suspect class, and we have concluded that the tolling statute does not impermissibly interfere with Defendant's constitutional right to travel. Thus, an equal protection analysis requires only "that the classification challenged be rationally related to a legitimate state interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S. Ct. 2513, 2516-17 (1976).

The tolling statute applies to any *party charged* with committing a crime and, as relevant here, was not usually and publicly resident within the state. T.C.A. § 40-2-103 (emphasis added). The statute, therefore, is directed toward any party, whether resident or nonresident, who commits a crime in this State and then leaves the State and applies equally to all persons falling within this classification. The United States Supreme Court has noted that the equal protection clause "announces a fundamental principle" that "the State must govern impartially." *New York City Transit Authority v. Beazer*, 440 U.S. 568, 587-88, 99 S. Ct. 1355, 1367 (1976). Therefore, "[g]eneral rules that apply evenhandedly to all persons within the jurisdiction unquestionably comply with this principle."

The tolling statute on its face applies equally to all persons who commit a crime in this State and then depart. Defendant offers no indication, and there is nothing in the record to suggest, that the tolling statute has been enforced against him any differently than it would be against anyone else who engaged in the same conduct. *Helms*, 452 U.S. at 423-24, 101 S. Ct. at 2442. We have previously concluded that the tolling statute is rationally related to the State's compelling interest in detecting and prosecuting crimes, and there is no evidence that the tolling statute has violated the requirement that the State impartially administer its laws. *Id.*, *New York City Transfer Authority*, 440 U.S. at 587, 99 S. Ct. 1366. Defendant is not entitled to relief on this issue.

Because Defendant's qualified right to travel was not impermissibly infringed, we need not consider Defendant's suggestion that the civil tolling statute be applied to criminal cases. *See Helms*, 452 U.S. at 425, 101 S. Ct. at 2443. The United States Supreme Court has instructed that "the State need not employ the least restrictive, or even the most effective, wisest, means to achieve its legitimate ends" in the absence of any infringement of a

fundamental right. *Id*. 452 U.S. at 425-26, 101 S. Ct. at 2443. Defendant is not entitled to relief on this issue.

## VI. Cumulative Effect of Errors

Defendant argues that the cumulative effect of the alleged errors rendered his trial fundamentally unfair. However, our careful review of the entire record reveals that there is no cumulative error that affected Defendant's right to a fair trial.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE